Slip Op. 06-48

UNITED STATES COURT OF INTERNATIONAL TRADE

```
- - - - - - - - - - - - - - - - - - x
CANADIAN LUMBER TRADE ALLIANCE;      :
NORSK HYDRO CANADA, INC.;            :
CANADIAN WHEAT BOARD; ONTARIO        :
FOREST INDUS. ASS'N; ONTARIO         :
LUMBER MFGS ASS'N; THE               :
FREE TRADE LUMBER COUNCIL;           :
                                     :
          and                        :
                                     :
THE GOVERNMENT OF CANADA,            :
                                     :
          Plaintiffs,                :
                                     :
                                     :
          v.                         :       Before: Pogue, Judge
                                     :       Consol. Ct. No. 05-00324
THE UNITED STATES OF AMERICA;        :
DEBORAH J. SPERO, ACTING             :
COMMISSIONER, UNITED STATES          :
CUSTOMS & BORDER PROTECTION;         :
and UNITED STATES CUSTOMS &          :
BORDER  PROTECTION,                  :
                                     :
          Defendants,                :
                                     :
          and                        :
                                     :
COALITION FOR FAIR LUMBER            :
IMPS. EXECUTIVE COMM.; U.S.          :
MAGNESIUM, LLC; UNITED STATES        :
STEEL CORP.; U.S. FOUNDRY &          :
MFG. CO.; NEENAH FOUNDRY CO.;        :
ALLEGHENY LUDLUM CORP; AK            :
STEEL CORP.; EAST JORDAN IRON        :
WORKS, INC.; LEBARON FOUNDRY         :
CORP.; MUNICIPAL CASTINGS,           :
INC.; and NORTH DAKOTA WHEAT         :
COMM'N;                              :
                                     :
     Defendant-Intervenors.          :
- - - - - - - - - - - - - - - - - - x
```

Decided: April 7, 2006

[Plaintiffs' motion granted in part; Defendant's motion granted in part]

Steptoe & Johnson, LLP (Mark A. Moran, Kaija Wadsworth, Matthew S. Yeo, and Michael T. Gershberg) for Plaintiff Canadian Lumber Trade Alliance;

Steptoe & Johnson, LLP (Gregory S. McCue) for Plaintiff Norsk Hydro Canada, LLC;

Steptoe & Johnson, LLP (Edward J. Krauland, Joel D. Kaufman, and Thomas R. Best)for Plaintiff Canadian Wheat Board;

Sidley Austin LLP (Neil R. Ellis, Andrew W. Shoyer, Carter G. Phillips, Lawrence R. Walders, and Richard D. Bernstein) for Plaintiff Government of Canada;

Baker & Hostetler, LLP (Elliot J. Feldman, John Burke, Michael S. Snarr, and Bryan J. Brown) for Plaintiffs Ontario Forest Industries Association, Ontario Lumber Manufacturers Association, and The Free Trade Lumber Council;

Stuart E. Schiffer, Deputy Assistant Attorney General; David M. Cohen, Director, Jean E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Kenneth M. Dintzer, Senior Trial Counsel, and David S. Silverbrand, Trial Attorney) for Defendant United States;

Dewey Ballantine LLP (Bradford L. Ward, Harry L. Clark, Linda A. Andros, Mayur R. Patel, and Rory F. Quirk) for Defendant-Intervenor Coalition for Fair Lumber Imports Executive Committee;

King & Spalding, LLP (Joseph W. Dorn, Stephen A. Jones, and Jeffrey M. Telep)for Defendant-Intervenor US Magnesium LLC;

Skadden Arps Slate Meagher & Flom, LLP (John J. Mangan, Jeffrey D. Gerrish, and Robert E. Lighthizer) for Defendant-Intervenor United States Steel Corporation;

Collier, Shannon, Scott, PLLC (Michael R. Kershow, Mary T. Staley, Paul C. Rosenthal, and Robin H. Gilbert) for Defendant-Intervenors Neenah Foundry Company, Municipal Castings, Incorporated, LeBaron Foundry Incorporated, East Jordan Iron Works, Incorporated, Allegheny Ludlum Corporation, and AK Steel Corporation;

Troutman Sanders LLP (Charles Alvin Hunnicutt, and G. Brent Connor) for Defendant-Intervenor North Dakota Wheat Commission.

Pillsbury, Winthrop, Shaw, Pittman, LLP (Stephan E. Becker, Sanjay J. Mullick, and Joshua D. Fitzhugh) for Amicus Curiae Government of Mexico.

OPINION

POGUE, Judge: This case presents two key questions: First, whether domestic law authorizes the Government of Canada and/or its exporters to challenge in this court the administration of the United States' trade laws, particularly the Continued Dumping and Subsidy Offset Act of 2000, Pub. L. No. 106-387, § 1003, 114 Stat. 1549, 1623 (2000) codified at 19 U.S.C. § 1675c (the "Byrd Amendment"). The United States Bureau of Customs and Border Protection ("Customs" or "Defendant" or "Commissioner"),[1] relying on the Byrd Amendment, distributes to domestic producers who are competitors of the Plaintiff Canadian exporters the duties collected as a result of antidumping and countervailing orders on Canadian goods. If Plaintiffs are authorized to challenge the Defendant's implementation of the Byrd Amendment by bringing this action, the second issue is whether Customs is authorized to distribute funds collected from duty orders on Canadian (and Mexican) imports of goods where the Byrd Amendment does not specifically so direct.

For the reasons stated below, the court finds that the Plaintiff Canadian exporters, but not the Government of Canada,

_____

[1]In this opinion, the term Defendants refers to Defendant and Defendant-Intervenors. The court has attempted, when possible, to properly attribute arguments.

are authorized to bring this action, and that Customs has violated U.S. law, specifically a provision of the NAFTA Implementation Act in applying the Byrd Amendment to antidumping and countervailing duties on goods from Canada and Mexico, 19 U.S.C. § 3438.

## BACKGROUND
### A.

In the early 1990's, the United States, Canada and Mexico negotiated, and signed, the North American Free Trade Agreement ("NAFTA"). See North American Free Trade Agreement Implementation Act Statement of Administrative Action ("SAA"), reprinted in H. R. Doc. No. 103-159, p. 1 (1993); Xerox Corp. v. United States, 423 F.3d 1356, 1358 (Fed. Cir. 2005); Made in the USA Found. v. United States, 242 F.3d 1300, 1302-03 (11th Cir. 2001). NAFTA aims to achieve "the liberalization of trade in goods and services, removal of barriers to investment, [and] the protection and enforcement of intellectual property rights[.]" SAA, reprinted in H. R. Doc. No. 103-159, p. 3 (1993).

As is relevant here, NAFTA allows the United States (and the other NAFTA parties) to amend their antidumping and countervailing duty laws "provided that . . . [any] amendment shall apply to goods from another Party only if the amending statute specifies that it applies to goods from that Party or

from the Parties to this Agreement."   North American Free Trade

Agreement, art. 1902(2)(a) (1993) (entered into force Jan. 1,

1994) (reprinted in Jackson, et al, 2002 Documents Supplement to

Legal Problems of International Economic Relations at 512 (4th

ed. 2002)) (emphasis added).[2]   NAFTA further requires that, if

---

[2]Article 1902 provides:

Retention of Domestic Antidumping Law and Countervailing Duty
Law

1. Each Party reserves the right to apply its antidumping law
and countervailing duty law to goods imported from the
territory of any other Party. Antidumping law and
countervailing duty law include, as appropriate for each
Party, relevant statutes, legislative history, regulations,
administrative practice and judicial precedents.

2. Each Party reserves the right to change or modify its
antidumping law or countervailing duty law, provided that in
the case of an amendment to a Party's antidumping or
countervailing duty statute:
     (a) such amendment shall apply to goods from another
     Party only if the amending statute specifies that it
     applies to goods from that Party or from the Parties to
     this Agreement;

     (b) the amending Party notifies in writing the Parties to
     which the amendment applies of the amending statute as
     far in advance as possible of the date of enactment of
     such statute;

     (c) following notification, the amending Party, on
     request of any Party to which the amendment applies,
     consults with that Party prior to the enactment of the
     amending statute; and

     (d) such amendment, as applicable to that other Party, is
     not inconsistent with
                                             (continued...)

the United States does amend its antidumping or countervailing duty laws as to goods from Canada or Mexico: (1) it will notify "in writing the Parties to which the amendment applies of the amending statute as far in advance as possible of the date of enactment of such statute," (2) it will consult with the affected party before adopting the amending statute, and (3) any such amendment may not run counter to the General Agreement on Tariffs and Trade ("GATT") or the principles of NAFTA.  Id. at art. 1902(2)(b)-(d).

Congress approved NAFTA in the North American Free Trade Agreement Implementation Act ("NAFTA Implementation Act") which

---

[2](...continued)

> (i) the General Agreement on Tariffs and Trade (GATT), the Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade (the Antidumping Code) or the Agreement on the Interpretation and Application of Articles VI, XVI and XXIII of the General Agreement on Tariffs and Trade (the Subsidies Code), or any successor agreement to which all the original signatories to this Agreement are party, or

> (ii) the object and purpose of this Agreement and this Chapter, which is to establish fair and predictable conditions for the progressive liberalization of trade between the Parties to this Agreement while maintaining effective and fair disciplines on unfair trade practices, such object and purpose to be ascertained from the provisions of this Agreement, its preamble and objectives, and the practices of the Parties.

also amended U.S. law to reflect the NAFTA framework. NAFTA
Implementation Act, Pub. L. No. 103-182, 107 Stat. 2060-2164
(1993), codified at 19 U.S.C. §§ 3301-3473 (2000). Specifically,
in implementing NAFTA art. 1902, Section 408 of the NAFTA
Implementation Act, codified at 19 U.S.C. § 3438 ("Section 408"),
provides that "[a]ny amendment . . . [to] title VII of the Tariff
Act of 1930 [19 U.S.C. §§ 1671 et seq.], or any successor statute
. . . shall apply to goods from a NAFTA country only to the
extent specified in the amendment." The NAFTA Implementation
Act, including 19 U.S.C. § 3438, became effective January 1,
1994.

**B.**

Subsequent to the passage of the NAFTA Implementation Act,
in 2000, Congress amended Title VII of the Tariff Act of 1930
with the passage of the Byrd Amendment, 19 U.S.C. § 1675c. The
passage of the Byrd Amendment was intended to strengthen the
remedial purposes of the antidumping and countervailing duty
laws.[3] Specifically, prior to the Byrd Amendment, under Title

---

[3]In adopting the Byrd Amendment, Congress made the following
specific findings:

> (1) Consistent with the rights of the United States
> under the World Trade Organization, injurious dumping
> is to be condemned and actionable subsidies which cause
> injury to domestic industries must be effectively

(continued...)

VII of the Tariff Act of 1930, Customs collected antidumping and

countervailing duties on dumped and subsidized imports,

implementing such orders to attempt to neutralize the distortive

and adverse effects of dumping and subsidization; Customs then

deposited all revenues collected from these duties into the U.S.

Treasury, from which the duties were available to pay for general

government expenses.  See generally 21A Am Jur 2d, Customs Duties

_____

(...continued)
      neutralized.

    (2) United States unfair trade laws have as their
    purpose the restoration of conditions of fair trade so
    that jobs and investment that should be in the United
    States are not lost through the false market signals.

    (3) The continued dumping or subsidization of imported
    products after the issuance of antidumping orders or
    findings or countervailing duty orders can frustrate
    the remedial purpose of the laws by preventing market
    prices from returning to fair levels.

    (4) Where dumping or subsidization continues, domestic
    producers will be reluctant to reinvest or rehire and
    may be unable to maintain pension and health care
    benefits that conditions of fair trade would permit.
    Similarly, small businesses and American farmers and
    ranchers may be unable to pay down accumulated debt, to
    obtain working capital, or to otherwise remain viable.

    (5) United States trade laws should be strengthened to
    see that the remedial purpose of those laws is
    achieved.

Continued Dumping and Subsidy Offset Act of 2000, Pub. L. No.
106-387, § 1(a), § 1002, 114 Stat. 1549, 1549A-72 (2000).

and Import Regulations § 221 (2004) ("In general, all receipts
from customs must be promptly paid into the Treasury.").

After the Byrd Amendment's passage, Customs still collects
antidumping and countervailing duties that attempt to neutralize
the distortive and adverse effects of dumping and subsidization,
but now, following the Byrd Amendment, Customs deposits all
duties collected into "special accounts" established within the
U.S. Treasury for each antidumping and countervailing duty order.
19 U.S.C. § 1675c(e);  19 C.F.R. § 159.64.[4]  In addition, each
year, Customs distributes all monies contained in those special
accounts, plus interest, on a pro rata basis, to "affected
domestic producers," i.e., companies (who continue to produce the
subject merchandise under the antidumping or countervailing duty
order) and worker groups that supported the petition for the
antidumping or countervailing duty order.  The funds distributed,
known as the "continued dumping and subsidy offset," 19 U.S.C. §
1675c(a);  19 C.F.R. §  159.61(a) ("Byrd Distributions"), are
intended to strengthen trade law remedies, through an allocation

---

[4]Customs deposits monies into special accounts only after the
entries of the goods have been liquidated, i.e., final duties
have been collected and deposited.  Prior to liquidation,
Customs deposits all monies collected, i.e., cash deposits, in
clearing accounts.  See 19 C.F.R. § 159.64(a).  When goods are
liquidated, the money in the clearing accounts are transferred to
special accounts.  See 19 C.F.R. § 159.64(b).

based on "qualifying expenditures," i.e., certain enumerated business expenses such as manufacturing facilities, equipment, input materials, health benefits for employees, and "[w]orking capital or other funds needed to maintain production," paid by affected domestic producers, 19 U.S.C. §§ 1675c(b)(4); 1675c(d)(2)-(3); 19 C.F.R. § 159.61(c).

On February 8, 2006, President Bush signed the Deficit Reduction Act of 2005 repealing the Byrd Amendment. See, Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 7601(b), 120 Stat. 4, 154 (2006). As provided by this repeal: "All duties on entries of goods made and filed before October 1, 2007, that would, but for [the repeal]" be distributed will continue to be distributed under the Byrd Amendment, 19 U.S.C. § 1675c." Id.

## C.

The Byrd Amendment does not specify that it applies to goods from Canada or Mexico, see 19 U.S.C. § 1675c, nor did the United States provide advance notice of the Byrd Amendment to Canada or Mexico or engage in consultations with regard thereto.

Seeking to challenge the Byrd Amendment, and alleging that the Byrd Amendment violated the Uruguay Round Agreements,[5] Canada

---

[5]The Uruguay Round Agreements are the most recent completed trade

(continued...)

and Mexico joined with nine other foreign governments in bringing a claim against the United States before the Dispute Resolution Body of the World Trade Organization ("WTO").[6]  In the proceedings, both a panel of the Dispute Resolution Body, Panel Reports, United States-Continued Dumping and Subsidy Offset Act of 2000, WT/DS217/R, WTDS234/R (Sept. 16, 2002), and the Appellate Body, Appellate Body Reports, United States-Continued Dumping and Subsidy Offset Act of 2000, WT/DS217/AB/R, WTDS234/AB/R (Jan. 16, 2003), ruled against the United States, determining that the Byrd Distributions were inconsistent with the Uruguay Round Agreements.[7]

_____

[5](...continued)
agreements conducted under the GATT (now the WTO).

[6]The other complaining nations were Australia, Brazil, Chile, the European Communities, India, Indonesia, Japan, Korea, and Thailand.  See Decision by the Arbitrator, United States – Continued Dumping and Subsidy Offset Act of 2000, ¶ 1.2 n.3, WT/DS234/ARB/CAN (Aug. 31, 2004).

[7]Specifically, the Panel found that the Byrd Amendment was not a specific, and therefore actionable, subsidy.  United States-Continued Dumping and Subsidy Offset Act of 2000,  ¶¶ 7.115-16, WT/DS217/R, WTDS234/R. This conclusion was not appealed. However, the WTO Appellate Body found that the Byrd Amendment was a "specific action against dumping" and a "specific action against a subsidy" not taken in accordance with GATT 1994. United States-Continued Dumping and Subsidy Offset Act of 2000, ¶ 318, WT/DS217/AB/R, WTDS234/AB/R.  Thus, while finding that the Byrd Distributions were not specific subsidies, the WTO found that Byrd Distributions were injurious to importers. See, e.g., United States-Continued Dumping and Subsidy Offset Act of 2000, ¶ 256, WT/DS217/AB/R, WTDS234/AB/R.   The court provides this only
                                                      (continued...)

Pursuant to the WTO adjudication, and after consultation and arbitration, the WTO authorized the complaining nations to suspend tariff concessions and other obligations in an amount equal to a portion of the prior Byrd Distributions which the WTO had determined to be improper. Decision by the Arbitrator, United States – Continued Dumping and Subsidy Offset Act of 2000, ¶ 5.2, WT/DS234/ARB/CAN (Aug. 31, 2004). Specifically, the WTO authorized Canada to suspend tariff concessions in an amount equal to 72% of the value of the United States' annual Byrd Distributions during fiscal 2004, id., that percentage having been determined to be "the extent to which disbursement under the [Byrd Amendment] affect[ed] exports" from Canada, id. at ¶ 3.76. Additionally, Canada is authorized to suspend tariff concessions, and other obligations, totaling 72% of the value of distributions made by the United States for all years subsequent to 2004 (as annually calculated by the arbitrator). Id. at ¶ 5.1. Pursuant to this authorization, Canada imposes a 15% surtax on imports of live swine, cigarettes, oysters, and certain speciality fish, from the United States. See International Trade Canada, Trade Negotiations and Agreements: Dispute Settlement (2005),

_____

(...continued)
as background information; the remainder of the court's opinion relies exclusively on U.S. law and principles pertaining thereto.

http://www.dfait-maeci.gc.ca/tna-nac/disp/factsheet-en.asp.   The
WTO has also approved Mexico's suspension of trade concessions
authorizing Mexico to impose tariffs ranging from 9% to 30% on
imports of chewing gum and candy, dairy, blends used for products
such as baby formula, and various wines from the United States.
See Decreto por el que se modifica temporalmente el artículo 1 el
Decreto por el que se establece la Tasa Aplicable durante 2003
del Impuesto General de Importacíon para las mercancías
originarias de América del Norte publicado el 31 diciembre de
2002 por lo que respecta para las mercancías originarias de EE.UU
[Decree temporarily modifying various tariff rates applied to
North American goods], Diario Oficial de la Federación [D.O.], 17
de Agosto de 2005  (Mex.) (2005) at 68-69, available at
http://gobernacion.gob.mx/dof/2005/
agosto/dof_17-08-2005.pdf.


**D.**

Plaintiffs in this case are producers and exporters of goods
from Canada (collectively "Canadian Producers") and the
Government of Canada ("Canada"); the Canadian Producers were all
subject to countervailing and antidumping duty orders at one
point of time since the passage of the Byrd Amendment and are
direct competitors with recipients of Byrd Distributions, see,

e.g., Allan Decl., Pl.'s Ex. 1 at 4; Vincent Decl., Pl.'s Ex. 2 at 4; Milton Decl., Pl.'s Ex. 3 at 3; LaFlamme Decl., Pl.'s Ex. 4 at 5; Beudry Decl., Pl.'s Ex. at 10; Thompson Decl., Pl.'s Ex. at 3. The Government of Mexico has also participated in these proceedings as an amicus curiae.

Plaintiffs the Canadian Lumber Trade Alliance, the Ontario Forest Industry Association, the Ontario Lumber Manufacturers Association, and the Free Trade Lumber Council ("Lumber Plaintiffs")[8] all represent Canadian Producers and exporters of softwood lumber whose imports into the United States are currently subject to antidumping and countervailing duty orders. See Certain Softwood Lumber Products From Canada, 67 Fed. Reg. 36,068 (Dep't Commerce May 22, 2002) (notice of amended final determination of sales at less than fair value and antidumping duty order), Certain Softwood Lumber Products From Canada, 67 Fed. Reg. 36,070 (Dep't Commerce May 22, 2002) (notice of amended final affirmative countervailing duty determination and notice of countervailing duty order). Based on these orders and pursuant to the Byrd Amendment, the Commissioner distributed $3,278,700.42 to 106 affected domestic producers in 2005, $5,378,612.97 to 126

---

[8]The parties do not dispute, and the court does not challenge, that these associations have standing on behalf of their members. See generally Automobile Workers v. Brock, 477 U.S. 274 282 (1986); Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 346 (1977).

affected domestic producers in 2004, and $73,422.34 to at least 102 affected domestic producers in 2003. Revised Jt. Stip. Undisp. Facts at 6, Ex. 1 to Pl.'s Status Report Regarding a Revised Stmt. Undisp. Mat. Facts (Jan. 20, 2006) ("Pl.'s Stip. Facts"); Jt. Stip. Undisp. Mat. Facts at para. 8-9 (Nov. 17, 2005) ("Def.-Int.'s Stip. Facts"). In addition, in accordance with these orders, Customs is currently holding cash deposits of $4,189,827,439.59 (as of October 1, 2005) from entries of imports awaiting liquidation. Pl.'s Stip. Facts at 10.

Plaintiff Norsk Hydro Canada Inc. ("Norsk") is a producer and exporter of pure and alloy magnesium ingots. Norsk's imports into the United States are currently subject to countervailing duties pursuant to Pure Magnesium and Alloy Magnesium From Canada, 57 Fed. Reg. 39,392 (Dept. Commerce August 31, 1992) (countervailing duty order). The Commissioner has distributed $25,486.40 in 2005, $63,405.69 in 2004, and $7,787.58 in 2003 to U.S. Magnesium (or its predecessor), Norsk's domestic competitor. Pl.'s Stip. Facts at 6-7; Def.-Int.'s Stip Facts at para. 10.[9] Under this order, Customs holds cash deposits (as of October 1, 2005) of $6,328,090.94. Pl.'s Stip. Facts at 10.

---

[9]There are numerous other orders on related products from Canada that are not detailed here.

Plaintiff the Canadian Wheat Board purchases hard red spring wheat from Canadian farmers and sells that wheat in Canada and export markets including the United States.  The Canadian Wheat Board was subject to antidumping and countervailing duty orders, Certain Durum and Hard Red Spring Wheat From Canada, 68 Fed. Reg. 52,747 (Dept. Commerce Sept. 5, 2003) (notice of final affirmative countervailing duty determinations); Certain Durum and Hard Red Spring Wheat From Canada, 68 Fed. Reg. 52,741 (Dept. Commerce Sept. 5, 2003) (notice of final determinations of antidumping duty investigations), until Commerce rescinded those orders effective as of January 2, 2006, Antidumping Duty Investigation and Countervailing Duty Investigation of Hard Red Spring Wheat from Canada: Notice of Panel Decision, Revocation of Countervailing and Antidumping Duty Orders and Termination of Suspension of Liquidation, 71 Fed. Reg. 8,275 (Dep't Commerce Feb. 16, 2005).  On June 1, 2005, Customs published a notice of intent to make distributions of monies collected from the Canadian Wheat Board identifying a single eligible affected domestic producer: Defendant-Intervenor the North Dakota Wheat Commission.  See Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers, 70 Fed. Reg. 31,566, 32,132 (Dep't Customs June 1, 2005) (notice of intent to distribute offset for Fiscal Year 2005).  Pursuant to the two

orders on hard red spring wheat from Canada, the Commissioner

distributed $127,643.68 to the North Dakota Wheat Commission

("NDWC") in November 2005, Def.'s Resp. Def. Int.'s Proposed

Stmt. Facts at para. 59 (Jan. 30, 2006), and currently holds cash

deposits of $290,021.87 from unliquidated entries (as of October

1, 2005), Pl.'s Stip. Facts at 10.

**E.**

Plaintiffs filed their summonses and complaints in this

action on April 29, 2005, claiming jurisdiction under 28 U.S.C.

§1581(i).[10]   On July 12, 2005, the Defendant moved to dismiss

---

[10]28 U.S.C. § 1581(i) provides:

In addition to the jurisdiction conferred upon the
Court of International Trade by subsections (a)-(h) of
this section and subject to the exception set forth in
subsection (j) of this section, the Court of
International Trade shall have exclusive jurisdiction
of any civil action commenced against the United
States, its agencies, or its officers, that arises out
of any law of the United States providing for--
   (1) revenue from imports or tonnage;
   (2) tariffs, duties, fees, or other taxes on the
      importation of merchandise for reasons other than
      the raising of revenue;
   (3) embargoes or other quantitative restrictions on
      the importation of merchandise for reasons other
      than the protection of the public health or
      safety; or
   (4) administration and enforcement with respect to
      the matters referred to in paragraphs (1)-(3) of
      this subsection and subsections (a)-(h) of this
      section.

(continued...)

each action pursuant to USCIT Rules 12(b)(1) and 12(b)(5), asserting that the court lacked subject matter jurisdiction and that the Plaintiffs had failed to state a claim for which relief could be granted because Plaintiffs' complaints were not authorized by domestic law.  In a telephone conference held on August 2, 2005, Plaintiffs informed the court that they would oppose the Defendant's motion to dismiss for lack of subject matter jurisdiction with affidavits and would be filing motions for summary judgment pursuant to USCIT Rule 56 (more appropriately, motions for judgment on the agency record under Rule 56.1).  Following the Supreme Court's suggestion in <u>Pennell v. San Jose</u>, 485 U.S. 1, 7 (1988) ("We strongly suggest that in future cases parties litigating in this Court under circumstances similar to those here take pains to supplement the record in any manner necessary to enable us to address with as much precision as possible any question of standing that may be raised."); <u>Bennett v. Spear</u>, 520 U.S. 154, 167-68 (1997) (outlining the

---

(...continued)
> This subsection shall not confer jurisdiction over an antidumping or countervailing duty determination which is reviewable either by the Court of International Trade under section 516A(a) of the Tariff Act of 1930 [19 U.S.C. § 1516a(a)] or by a binational panel under article 1904 of the North American Free Trade Agreement or the United States-Canada Free-Trade Agreement and section 516A(g) of the Tariff Act of 1930 [19 U.S.C. § 1516a(g)].

evidentiary requirements of standing), the court, in light of the Plaintiffs' proposed filings, converted all pending motions into cross motions for summary judgment/motions for judgment on the agency record,[11] and pursuant to Rule 56 (d), on March 27 and March 28, 2006, held a hearing to resolve any disputed facts related to jurisdiction.   The court also granted a motion by Plaintiffs to consolidate all of Plaintiffs' cases under Docket Number 05-324.

## I. Overview

Defendant and Defendant-Intervenors allege numerous jurisdictional defects in the Plaintiffs' Complaints.   Because jurisdictional bars to entertaining Plaintiffs' suits are a threshold inquiry, <u>Ruhrgas AG v. Marathon Oil Co.</u>, 526 U.S. 574, 577-78 (1999); <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 89-102 (1998), the court must find that jurisdiction exists before it may reach the merits.   Nevertheless, because many of

---

[11]The Defendant correctly notes that the merits of this case are solely determined on the basis of the administrative record.  As such, the court has no fact-finding role with respect to the merits of the case at bar.  Therefore, in this instance, a motion to dismiss brought under USCIT R. 12(b)(5) is effectively the same as a motion for judgment on the agency record brought under USCIT Rule 56.1.  Accordingly, in the interests of a "just, speedy, and inexpensive," resolution of such cases, USCIT R. 1, the court prefers that parties move under USCIT Rule 56.1 for judgment on the agency record.

the jurisdictional arguments depend on at least a superficial understanding of the statutory scheme at issue, the court will here briefly discuss the text, purpose, and effect of Section 408 while leaving discussion of the bona fide disagreements over its interpretation to Section V below.

Plaintiffs, including Canada, raise their claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, to enforce Section 408 of the NAFTA Implementation Act as applied to Customs' administration of the Byrd Amendment. Plaintiffs ask the court to: (1) find unlawful Defendant's disbursements of monies collected on goods from Canada; (2) permanently enjoin future distributions; and (3) instruct Defendants to reclaim distributions made on March 15, 2004 and December 17, 2004. See, e.g., Gov't Canada Compl. 9, Can. Lum. Compl. 11-12.

It follows that, while Plaintiffs' causes of action are stated under the APA, the thrust of Plaintiffs' claims rest on Section 408. Section 408 provides that:

> Any amendment enacted after the Agreement enters into force with respect to the United States that is made to--
>     (1) section 303 or title VII of the Tariff Act of 1930 [19 U.S.C. §§ 1671 et seq.], or any successor statute, or
>     (2) any other statute which--
>       (A) provides for judicial review of final determinations under such section, title, or successor statute, or

> (B) indicates the standard of review to be applied,
>
> shall apply to goods from a NAFTA country only to the extent specified in the amendment.

By requiring that amendments apply to goods from Canada and Mexico "only to the extent specified in the amendment," Congress, through Section 408, imposed a "magic words"[12] rule of interpretation on amendments to U.S. trade laws, i.e., that any amendment to title VII of the Tariff Act of 1930 must contain certain "magic words" for Congress to indicate that it intends to alter antidumping and countervailing duty laws with respect to NAFTA parties. SAA, reprinted in H.R. Doc. No. 103-159, p. 203 (1993) ("Section 408 of the bill implements the requirement of Article 1902 that amendments to the AD and CVD laws shall apply to a NAFTA country only if the amendment so states explicitly.").

---

[12]A "magic words" rule, also referred to as a "magical password," "express-reference" or "express-statement" rule, is a strict clear statement rule which requires the use of certain words to signal a particular Congressional intent. See, e.g., Lockhart v. United States, 126 S. Ct. 699, 703 (2005); cf. Demore v. Kim, 538 U.S. 510, 517 (2003) (discussing INS v. St. Cyr, 533 U.S. 289, 327 (2001) (Scalia, J. concurring). Here, the required "magic words" are "shall apply to goods from Canada and Mexico." Cf. Section 234, Uruguay Round Agreements Act, 108 Stat. 4809, 4901 (1994) ("Pursuant to article 1902 of the North American Free Trade Agreement and section 408 of the North American Free Trade Agreement Implementation Act, the amendments made by this title shall apply with respect to goods from Canada and Mexico."). The court reserves discussion of the propriety of a "magic words" rule for Section V.b below.

In so doing, Section 408 insulates NAFTA parties, including their exporters, from some changes to the antidumping and countervailing duty laws unless Congress has explicitly stated otherwise. Such an exercise of self-restraint was intended to ensure that future Congresses, agencies, and courts did not inadvertently abrogate the rights NAFTA parties negotiated, or, alternatively, to require future Congresses to give due consideration to the United States' NAFTA obligations before they amend the antidumping and countervailing duty laws. See id.; cf. Spector v. Norwegian Cruise Line Ltd., 125B S. Ct. 2169, 2182 (2005) ("These clear statement rules ensure Congress does not, by broad or general language, legislate on a sensitive topic inadvertently or without due deliberation."); EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991) (applying a clear statement rule "to protect against unintended clashes between [U.S.] laws and those of other nations which could result in international discord" which Congress presumably seeks to avoid); Lauritzen v. Larsen, 345 U.S. 571, 582 (1953) (applying the Charming Betsy canon, a clear statement canon, because, "in dealing with international commerce we cannot be unmindful of the necessity for mutual forbearance if retaliations are to be avoided[.]"). Consequently, Plaintiffs claim, when the Byrd Amendment is read in conjunction with Section 408, the Byrd Amendment states that

Customs shall distribute monies collected on duty orders except for duty orders on goods from Canada or Mexico.

With this overview in mind, the court will first consider the Defendant and Defendant-Intervenors' jurisdictional objections. Taken together, the Defendant and Defendant-Intervenors' assert that (1) the Plaintiffs lack the legal capacity to bring their complaints, i.e., they lack standing (both under Article III and because of prudential limitations on standing); and (2) Plaintiffs' claims are barred by the political question doctrine.[13] Relatedly,[14] Defendant and Defendant-Intervenors contend that Plaintiffs cause of action is barred by

_____

[13]All parties agree, as they must, that Congress' repeal of the Byrd Amendment does not moot this case. Not only are Plaintiffs seeking disgorgement of prior distributions which the repeal does not address, but also, because the repeal is not effective until October 1, 2007, see Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 7601(b), 120 Stat. 4, 154 (2006), injunctive relief may still be appropriate for monies collected until October 1, 2007.

[14]"The question whether a federal statute creates a claim for relief is not jurisdictional." Nw. Airlines, Inc. v. County of Kent, 510 U.S. 355, 365 (1994); Air Courier Conf. v. Am. Postal Workers Union, 498 U.S. 517, 523 n.3 (1991) (absence of a cause of action defense is waiveable because "[w]hether a cause of action exists is not a question of jurisdiction."). Cf. Steel Co., 523 U.S. at 89 ("the absence of a valid (as opposed to arguable) cause of action does not implicate [a court's] subject matter jurisdiction"); Mathews v. Eldridge, 424 U.S. 319, 330 (1976) (finding that the "final agency action" requirement of the APA is waiveable). The court discusses whether Plaintiffs have a cause of action in Section IV below.

Section 102(c) of the NAFTA Implementation Act, codified at 19 U.S.C. § 3312(c).  Because the court finds that it does have jurisdiction with respect to the Canadian Producers, and that they have a cause of action under U.S. law, it will then consider the merits.


## II. STANDING

Article III of the United States Constitution provides that "[t]he judicial Power shall extend to [certain] Cases . . . [and] Controversies . . . ."  U.S. Const. art. III, § 2, cl. 1; cf. 28 U.S.C. § 251 (establishing the Court of International Trade as an Article III court).  In accordance with this language, courts have required that every pending matter before an Article III Court be a "case" or "controversy."  See Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 471 (1982).  One of the cornerstones of this inquiry is whether the complaining parties have standing to raise their claims.

"In . . . pedestrian terms, [standing] is an answer to the very first question that is sometimes rudely asked when one person complains of another's actions: 'What's it to you?'" Antonin Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U. L. Rev. 881, 882

(1983).  Specifically as this question relates to challenges to administrative decision making, Plaintiffs must demonstrate that they have been, or likely will be, injured by Defendant's conduct, in a manner redressable by the court, and that the prudential considerations have been met.  Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479, 488 (1998) ("NCUA"); Dir. v. Newport News Shipbuilding & Dry Dock Co., 514 U.S. 122, 126-27 (1995);  Ass'n of Data Processing Service Org., Inc. v. Camp, 397 U.S. 150, 152-53 (1970) ("Data Processing"). Each prong will be addressed in turn.

**A. Article III Standing:**

Article III standing requires plaintiffs to demonstrate: (1) that they have suffered some injury-in-fact; (2) a causal connection between the defendant's conduct and this injury-in-fact; and (3) that this injury is redressable by the court. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) ("Defenders of Wildlife") (citations omitted).  Although the prongs of the test are not always factually separable, each prong must be satisfied.  See, e.g., Allen v. Wright, 468 U.S. 737, 753 n.19 (1984); Wyo. Sawmills Inc. v. U.S. Forest Serv., 383 F.3d 1241, 1247-48 (10th Cir. 2004), cert. denied 126 S. Ct. 330 (2005); The Friends for Ferrell Parkway, LLC v. Stasko, 282 F.3d

315, 320 (4th Cir. 2002). Because the Canadian Producers'
standing claim turns on a different analysis than that of the
Government of Canada, the court will consider each claim
separately.


*i. Canadian Producers' Standing*

**a. The Injury-in-fact Requirement**

Article III first requires Plaintiffs to demonstrate that
they have suffered an injury-in-fact "which is (a) concrete and
particularized, [and] (b) 'actual or imminent, not conjectural or
hypothetical.'" Defenders of Wildlife, 504 U.S. at 560 (quoting
Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)). The injury-in-
fact requirement aims not to shield defendants from litigation,
but to ensure that the plaintiffs have a stake in the fight and
will therefore diligently prosecute the case, United Food &
Commer. Workers Union Local 751 v. Brown Group, Inc., 517 U.S.
544, 556 (1996) (the standing requirement assures "adversarial
vigor"); Sierra Club v. Morton, 405 U.S. 727, 740 (1972), while,
at the same time, ensuring that the claim is not abstract or
conjectural so that resolution by the judiciary is both
manageable and proper, Fed. Election Comm'n v. Akins, 524 U.S.
11, 20 (1998); Allen, 468 U.S. at 752; Los Angeles v. Lyons, 461
U.S. 95, 101 (1983). Accordingly, while injury-in-fact must be

found in every case regardless of the statutory provision at issue, <u>Defenders of Wildlife</u>, 504 U.S. at 577-78; <u>Simon v. E. Ky. Welfare Rights Org.</u>, 426 U.S. 26, 39 (1976), it is nonetheless a "very generous" test, requiring only that claimants "allege[] some specific identifiable trifle of injury . . . ." <u>Bowman v. Wilson</u>, 672 F.2d 1145, 1151 (3rd Cir. 1982) (citing <u>United States v. SCRAP</u>, 412 U.S. 669, 689 n.14 (1973) (rejecting the argument that plaintiffs' interests must be "significantly" affected, noting that only an "identifiable trifle" is sufficient)).

Applying these principles, courts "routinely recognize probable economic injury resulting from [governmental actions] that alter competitive conditions [are] sufficient to satisfy the [Article III 'injury-in-fact' requirement]." <u>Clinton v. City of New York</u>, 524 U.S. 417, 433 (1998) (quoting III Kenneth Kulp Davis & Richard J. Pierce, <u>Administrative Law Treatise</u> 13-14 (3d ed. 1994)). Accordingly, courts have held that parties may "'suffer constitutional injury in fact when agencies . . . allow increased competition' against them." <u>U.S. Telecom Ass'n v. FCC</u>, 295 F.3d 1326, 1331 (D.C. Cir. 2002) (quoting <u>La. Energy & Power Auth. v. FERC</u>, 141 F.3d 364, 367 (D.C. Cir. 1998)).

In this case, there can be no doubt that the Plaintiffs are direct competitors with the recipients of Byrd Amendment distributions. <u>Cf.</u> <u>Sualt Ste. Marie Tribe of Chippewa Indians v.</u>

United States, 288 F.3d 910, 916 (6th Cir. 2002) (denying standing because plaintiff failed to offer any evidence that a casino forty miles away would detract from its business); Dek Energy Co. v. FERC, 248 F.3d 1192, 1196 (D.C. Cir. 2001) (denying standing because of only a "vague probability" that competitor's product would "actually reach that market and a still lower probability that its arrival will cause [plaintiff] to lose business or drop its prices."); Area Transp., Inc. v. Ettinger, 219 F.3d 671, 673 (7th Cir. 2000) (where competitor was barred from the market, plaintiff lacked standing to seek disgorgement of subsidy). If it were not the case that the Canadian Producers and the domestic industries are direct competitors, it would be unlikely that the domestic producers would be entitled to obtain the protection of the underlying antidumping and countervailing duty orders that are the source of the Byrd Distributions. See, e.g., 19 U.S.C. §§ 1671d(b)(1) & 1673d(b)(1) (requiring International Trade Commission to find material injury); 19 U.S.C. § 1675a(a) (same); 19 U.S.C. § 1677(9)(A) (defining interested parties to proceedings to include producers of the subject merchandise). Nor can it be seriously questioned that a direct payment to, i.e., conferring of a subsidy on, a direct competitor may be sufficient to cause increased competition and therefore "a concrete and particularized injury" that is "actual

or imminent."   See, e.g., W. Lynn Creamery, Inc. v. Healy, 512

U.S. 186, 195 n.10 & 196 n.12 (1994);[15] Bacchus Imps., Ltd. v.

---

[15]The Supreme Court did not discuss standing in W. Lynn Creamery.
Nevertheless, the Court did discuss at length the injurious
effect of subsidies, see W. Lynn Creamery, 512 U.S. at 195 n.10,
and the Court has incorporated W. Lynn Creamery, and its
analysis, into its standing jurisprudence.  See Gen. Motors Corp.
v. Tracy, 519 U.S. 278, 287 (1997).
     Both Defendant and Defendant-Intervenors rely on the W. Lynn
Creamery Court's statement that "[a] pure subsidy funded out of
general revenue imposes no burden on interstate commerce, but
merely assists local business," to argue that the Byrd
Distributions do not cause competitive injuries.  See, e.g.,
Def.'s Supp. Br. at 25 (quoting W. Lynn Creamery, 512 U.S. at
199).  This reliance, however, is misplaced for two reasons.
First, the scheme at issue here is not funded out of "general
revenue sources" but from special accounts funded by duty orders
on foreign competitors.  Therefore, the Court's statement, under
its own terms, cannot aid the Defendant and Defendant-
Intervenors.  See id. ("The pricing order in this case, however,
is funded principally from taxes on the sale of milk produced in
other states.").  Secondly, this court agrees with Justice
Scalia's assessment of this language when he stated in his
concurrence:

     The Court guardedly asserts that a "pure subsidy funded
     out of general revenue ordinarily imposes no burden on
     interstate commerce, but merely assists local business,"
     but under its analysis that must be taken to be true
     only because most local businesses (e.g., the local
     hardware store) are not competing with businesses out of
     State.

W. Lynn Creamery, 512 U.S. at 208 (Scalia, J. concurring)
(citation omitted) (emphasis in original).  Here, this
assumption does not hold as the recipients of Byrd
Distributions are most assuredly "competing with businesses
out of State."  Consequently, the majority's discussion of how
it is axiomatic that subsidies harm competitors, e.g., W. Lynn
Creamery, 512 U.S. at 195 n.10, is in no way negated by this
statement.

Dias, 468 U.S. 263, 267 (1984);[16] United States Telecom Ass'n, 295 F.3d at 1326; Exxon Co., U.S.A. v. FERC, 182 F.3d 30, 43 (D.C. Cir. 1999); Adams v. Watson, 10 F.3d 915, 920-21 (1st Cir. 1993); Westport Taxi Serv., Inc. v. Adams, 571 F.2d 697, 700-01 (2d Cir. 1978); Rental Hous. Ass'n of Greater Lynn, Inc. v. Hills, 548 F.2d 388, 389-90 (1st Cir. 1977); Ray Baillie Trash Hauling, Inc. v. Kleppe, 477 F.2d 696, 701 (5th Cir. 1973). Cf. Area Transp., Inc. v. Ettinger, 219 F.3d at 673. Indeed, it must be the case that subsidies to competitors confer standing under our trade laws -- if parties did not suffer an injury-in-fact from an agency's failure to countermand such a subsidy, then no member of the domestic industry would have standing to challenge a negative determination by the Department of Commerce or International Trade Commission in an antidumping and countervailing duty case, see Shieldalloy Metallurgical Corp. v. United States, 20 CIT 1362, 1374, 947 F. Supp. 525, 536 (1996) ("As a direct competitor of Shieldalloy, Galt would suffer injury

---

[16]Bacchus involved a challenge to a tax exemption which is similar to, and results in similar ends, as a subsidy. See Regan v. Taxation with Representation of Wash., 461 U.S. 540, 544 (1983); cf. Camps v. Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 588-594 (1997) (although factually similar, tax exemptions are permitted under the Establishment Clause whereas subsidies are not); W. Lynn Creamery, 512 U.S. at 207-12 (Scalia, J. concurring) (noting that although they achieve the same result, it appears that subsidies are permissible under the Dormant Commerce Clause whereas tax exemptions are not).

in fact if Commerce were to calculate Shieldalloy's dumping margin based on distorted or impermissible data."), or (perhaps), even intervene in such cases before this Court, <u>Diamond v. Charles</u>, 476 U.S. 54, 68-69 (1986) (leaving open whether intervenors must have standing).[17]

---

[17]The Defendant also tries to distinguish <u>Shieldalloy Metallurgical Corp.</u>, 20 CIT 1362, 947 F. Supp. 525 (1996), asserting that, in that case, the statute provided standing. This argument fails to recognize that injury-in-fact is an indispensable constitutional minimum. No act of Congress may displace this requirement. <u>Defenders of Wildlife</u>, 504 U.S. at 560; <u>Muskrat v. United States</u>, 219 U.S. 346, 362 (1911). Therefore, the Article III injury does not turn on whether Congress has granted parties a cause of action. <u>See Defenders of Wildlife</u>, 504 U.S. at 576 ("[T]here is absolutely no basis for making the Article III inquiry turn on the source of the asserted right."); <u>Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton</u>, 422 F.3d 490, 497 (7th Cir. 2005); compare <u>Clinton</u>, 524 U.S. at 433-34 n.22 <u>with</u> <u>id.</u> at 456 (Scalia J. dissenting); <u>cf.</u> <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 103 n.5 (1998) ("Also contrary to JUSTICE STEVENS' unprecedented suggestion . . . redressability -- like the other prongs of the standing inquiry -- does not depend on the defendant's status as a governmental entity." (citation omitted)). The court further notes that whatever minimum evidentiary requirement applies here must apply to all cases; this requirement is blind to whether the plaintiff is a member of the domestic industry appealing a negative determination or an importer appealing an affirmative determination. Furthermore, standing is a matter this court must determine <u>de novo</u>, <u>Fieldturf Inc. v. Sw. Recreational Indus., Inc.</u>, 357 F.3d 1266, 1268 (Fed. Cir. 2004); therefore, whatever standard the court applies here, it must apply in every case nothwithstanding a finding of material injury by the International Trade Commission. <u>See</u> <u>generally</u> <u>Steel Co.</u>, 523 U.S. at 94 (the question of standing is one the court is "bound to ask and answer for itself" (quoting <u>Great S. Fire Proof Hotel Co. v. Jones</u>, 177 U.S. 449, 453 (1900)); <u>cf.</u> <u>United Transp. Union v. ICC</u>, 891 F.2d 908, 916 (D.C. Cir. 1989) (while the court may

(continued...)

Nevertheless, both Defendant and Defendant-Intervenors argue that the Canadian Producers do not have standing to maintain their challenge because: (a) the Complaints did not sufficiently plead standing; (b) economic injury is an insufficient basis to confer standing; and (c) Plaintiffs have suffered no injury-in-fact as a matter of fact.  Each objection will be addressed in turn.

   *1) Sufficiency of the Complaints*

---

[17](...continued)
consider Congressional findings, it must ultimately conclude for itself that standing exists).  Certainly, many injury determinations by the International Trade Commission are not based on the type of specific injuries that the Defendants would have us require.
   Even after oral argument, the Defendant continues to press its attempt to distinguish Shieldalloy.  Citing Warth v. Seldin, 422 U.S. 490, 514 (1975) ("Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue even where plaintiff would have suffered no judicially cognizable injury in the absence of statute."), the Defendant argues that because "an aggrieved petitioner for an antidumping or countervailing duty order may challenge a final negative injury determination by the International Trade Commission ("ITC") contending that it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law,' 19 U.S.C. § 1516a," Congress has created a statutory right of the type contemplated by Warth, "(i.e., by enacting the antidumping and countervailing duty statutes, Congress has made 'legally cognizable,' a petitioner's claim)." Def.'s Post-Hearing Supp. Br. at 3.
   This argument, however, ignores the requirements of Defenders of Wildlife that constitutional standing be met in every case; in addition, it inappropriately conflates the analysis of a plaintiff's cause of action with the analysis of standing.  See infra at pp. 43-44.

In their Complaints, the Canadian Producers allege that they are exporters in "direct competition" with recipients of Byrd Distributions, and that they "have suffered, and will continue to suffer harm to their economic and competitive interests as a result of the distribution of funds pursuant to [the Byrd Amendment]." Can. Lum. Compl. 4. See also Norsk Compl. 4 (same); Ontario Forest Indus. Compl. 3; CWB Compl. 3 (alleging that it "will suffer harm to its economic interests"). The Defendant, citing the Federal Circuit's decision in McKinney v. U.S. Dep't of Treasury, 799 F.2d 1544, 1555 (Fed. Cir. 1986), avers that the Canadian Producers alleged no "specific injury whatsoever" in their complaints. Def.'s Mem. Supp. Def.'s Mot. Dismiss at 16 ("Def.'s Mem."). See also Def.'s Combined Reply Supp. Mot. Dismiss & Opp. Pl.'s Mot. Summ. J. at 25-26 ("Def.'s Reply").[18]

---

[18]Defendant's argument also overlooks the fact that a court, in considering a motion to dismiss under 12(b)(1), may look at materials outside the complaint. Def.'s Reply at 9 (quoting Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1584 (Fed. Cir. 1993)). In other words, the court need not limit itself to the four corners of the complaint, but may consider affidavits, reports by the International Trade Commission, Congressional Research Service, factual assessments by the WTO, or the statute itself, see Section II(1)(C) below. Moreover, (and as Defendant-Intervenors appear to concede with regard to cases in which standing is uncontested) the Supreme Court has required very little evidence in finding economic injuries cognizable. See, e.g., Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 395 (1987);

(continued...)

Although Defendant's argument may be supported by language in <u>McKinney</u>, in the years since that decision, the Supreme Court has clarified pleading requirements for standing. <u>See</u>, <u>e.g.</u>, <u>Bennett v. Spear</u>, 520 U.S. 154, 167-68 (1997); <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 889 (1990) ("<u>Nat'l Wildlife Fed'n</u>"). According to the Supreme Court's current articulation of the pleading requirements, "each element of Article III standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, <u>i.e.</u>, with the manner and degree of evidence required at the successive stages of the litigation.'" <u>Bennett</u>, 520 U.S. at 167-68 (quoting <u>Defenders of Wildlife</u>, 504 U.S. at 561). Because Plaintiffs' Complaint need only "set forth . . . a short and plain statement of the grounds upon which the court's jurisdiction depends," USCIT R. 8, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the

---

(...continued)
<u>Bacchus Imp., Ltd.</u>, 468 U.S. at 267 (the regulation "increase[d] the price of [plaintiffs'] products as compared to the exempted beverages, and the wholesalers are surely entitled to litigate whether the discriminatory tax has had an adverse competitive impact on their business."); <u>Bryant v. Yellen</u>, 447 U.S. 352, 367 (1980).

claim.'" <u>Defenders of Wildlife</u>, 504 U.S. at 561 (quoting <u>Nat'l</u>

<u>Wildlife Fed'n</u>, 497 U.S. at 889).  Consequently, a district court

may only dismiss a complaint if it can presume no "specific facts

under which the petitioners will be injured."  <u>Bennett</u>, 520 U.S.

at 168; <u>see also</u> <u>Baur v. Veneman</u>, 352 F.3d 625, 631 (2d Cir.

2003); <u>Alliant Energy Corp. v. Bie</u>, 277 F.3d 916, 920 (7th Cir.

2002) (Easterbrook, J.) ("supplying details is not the function

of a complaint. It is easy to imagine facts <u>consistent with</u> this

complaint and affidavits that will show plaintiffs' standing, and

no more is required." (emphasis in original)); <u>S. Austin Coal.</u>

<u>Cmty. Council v. SBC Commc'ns., Inc.</u>, 274 F.3d 1168, 1171 (7th

Cir. 2001) ("Complaints need not be elaborate, and in this

respect injury (and thus standing) is no different from any other

matter that may be alleged generally."); <u>S. Christian Leadership</u>

<u>Conf. v. Supreme Court of La.</u>, 252 F.3d 781, 788 (5th Cir. 2001)

(noting the "expansive and deferential way in which [courts]

construe pleadings" with respect to injury).[19]

Applying the rule stated in <u>Defenders of Wildlife</u>, in this

case, the court cannot fail to presume the specific facts

necessary to satisfy standing here because such consequences are

implicit in the statutory scheme itself.  Here, it is apparent

---

[19]Neither Defendant nor Defendant-Intervenors offered an
explanation as to why the Complaints did not meet this standard.

that the Plaintiffs' sales may be diverted to a competitor that is better able to compete as a result of the Byrd Amendment distributions. See, e.g., W. Lynn Creamery, Inc., 512 U.S. at 195 n.10 & 196 n.12; Data Processing, 397 U.S. at 152 (proving injury by reference to customers who had switched to competitors); Inv. Co. Inst. v. Camp, 401 U.S. 617, 620 (1971); FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 476-77 (1940) (granting license to competitor sufficient to satisfy injury-in-fact); Leaf Tobacco Exp. Ass'n v. Block, 749 F.2d 1106, 1112 (4th Cir. 1984); Ray Baillie, 477 F.2d at 701 (Government contract scheme "enabled [plaintiff's competitor] to receive a premium price above that which would have prevailed under competitive bidding and that [its competitor has] since used this premium to submit low bids for private commercial contracts, thus causing the plaintiffs to lose some of their customers to [its competitor]."). See also C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 430 (1994) (Souter, J. dissenting) ("a subsidized competitor can effectively squelch competition by underbidding it."); United States v. Butler, 297 U.S. 1, 71 (1936) ("If the cotton grower elects not to accept the [subsidy], he will receive less for his crops; those who receive payments will be able to undersell him."). Relatedly, Plaintiffs' comparative advantage may be undermined thereby reducing the

price they may charge (and therefore reducing their profit margins).  See, e.g., Sugar Cane Growers Coop. of Fla. v. Veneman, 289 F.3d 89, 94 (D.C. Cir. 2002); Minn. Milk Producers Ass'n v. Madigan, 956 F.2d 816, 817-19 (8th Cir. 1992) (agency action which causes supply to increase created injury); Bullfrog Films, Inc. v. Wick, 847 F.2d 502, 506 (9th Cir. 1988) (injury caused by a tax which upset comparative advantage); Panhandle Producers & Royalty Owners Ass'n v. Econ. Regulatory Admin., 822 F.2d 1105, 1108-09 (D.C. Cir. 1987) ("Under undisputed economic principles, such an increase in supply is likely to depress the prices that petitioner's members can secure."); Tax Analysts & Advocates v. Blumenthal, 566 F.2d 130, 137-38 (D.C. Cir. 1977) (same); cf. Bryant, 447 U.S. at 367 (government program that made possible the sale of excess lands at below market price sufficient to confer standing on potential purchasers interested in maintaining program).  The increase (or sustaining) of competition may cause Plaintiffs' costs to grow to counter this competition, again reducing their profit margin.  See, e.g., Nat'l Park Hospitality Ass'n v. DOI, 538 U.S. 803, 819 (2003) (Breyer, J. dissenting); DIRECTV, Inc. v. FCC, 110 F.3d 817, 830 (D.C. Cir. 1997) (injury caused by divesture requirement in bidding process); cf. Clinton, 524 U.S. at 432 (denial of benefit during bargaining process sufficient to confer standing).  The

competitiveness of the market may make Plaintiffs' business ventures less attractive to potential investors, reducing the Plaintiffs' ability to raise capital or sell their business interests.   See, e.g., Alliant Energy Corp., 277 F.3d at 920 ("Higher costs of capital injure the firm, making [plaintiffs] the right plaintiffs."); Mount Wilson FM Broadcasters, Inc. v. FCC, 884 F.2d 1462, 1465 (D.C. Cir. 1987) (approving this theory); Tax Analysts, 566 F.2d at 136-37; cf. McKinney, 799 F.2d at 1555.

Because economic logic suggests that Plaintiffs have been injured, and because Defendant-Intervenors are the only parties who would have any evidence as to how the distributions have been, and will be, used and, therefore, whether they have enhanced affected domestic producers' abilities to compete, requiring anything further in the way of allegations at the pleading stage would convert pleading requirements into a formidable barrier – a result at odds with the liberal notice pleading requirements underlying USCIT R. 8.   See, e.g., United Transp. Union, 891 F.2d at 912 n.7 ("Allegations founded on economic principles such as . . . in competitor standing cases, while perhaps not as reliable as allegations based on the laws of physics, are at least more akin to demonstrable facts than are predictions based only on speculation.");   Alliance for Clean

Coal v. Miller, 44 F.3d 591, 593-94 (7th Cir. 1995); cf. Sugar Cane Growers, 289 F.3d at 94 (it was the Government's burden if it wanted to contest Plaintiff's economic theory of injury to request a hearing); Alliant Energy Corp., 277 F.3d at 916 (plaintiff does not have to negate defenses in its complaint); Adams, 10 F.3d at 925 (defendants can refute economic theory at summary judgment or an evidentiary hearing). This principle is especially true here given that subsidies are known for their lack of transparency. See Alan O. Sykes, Regulatory Protectionism and the Law of International Trade, 66 U. Chi. L. Rev. 1, 30-31 (1999); cf. Testimony of Dr. David John Teece, Trial Transcript of March 28, 2006 Hearing at 282.

Accordingly, following clear Supreme Court precedent, Defendant's argument to dismiss on this basis must be rejected.

*2) Whether competitive injuries are cognizable*

Defendant and Defendant-Intervenors contend that economic injuries are not cognizable within the meaning of the injury-in-fact test. See, e.g., Def.'s Reply at 22-24; Def.'s Mem. at 14, 17; Def.-Int.'s Reply Mot. Supp. Def.-Int.'s Mot. Summ. J. & Resp. Opp. Pl.'s Cross-Mot. Summ. J. at 30-32 ("Def.-Int.'s Reply"). Specifically, relying on the Supreme Court's statement in Hardin v. Ky. Utils. Co., 390 U.S. 1, 5-6 (1968) that "[t]his

Court has, it is true, repeatedly held that the economic injury which results from lawful competition cannot, in and of itself, confer standing on the injured business to question the legality of any aspect of its competitor's operations," and the proposition that there is no constitutional right to import, see, e.g., Norwegian Nitrogen Prods. Co. v. United States, 288 U.S. 294, 318 (1933); Bd. of Trustees of the Univ. of Ill. v. United States, 289 U.S. 48, 58 (1933), Defendant and Defendant-Intervenors argue that Plaintiffs have suffered no injury. The court disagrees.

First, Defendant and Defendant-Intervenors' reliance on this authority is unfounded. Although they correctly quote one line of Hardin, the very next lines of that decision read:

> But competitive injury provided no basis for standing in the above cases simply because the statutory and constitutional requirements that the plaintiff sought to enforce were in no way concerned with protecting against competitive injury. In contrast, it has been the rule, at least since the Chicago Junction Case, 264 U.S. 258 (1924), that when the particular statutory provision invoked does reflect a legislative purpose to protect a competitive interest, the injured competitor has standing to require compliance with that provision.

Hardin, 390 U.S. at 6 (emphasis added).[20]   The Hardin Court then

went on to find standing because of competitive injuries.   Id.

Neither Defendant, nor Defendant-Intervenors, mention this second

and third sentence, or the Court's holding.

Defendant-Intervenors attempt to buttress their argument by

quoting Arnold Tours, Inc. v. Camp, 408 F.2d 1147, 1149 (1st Cir.

1969) ("because of the policy encouraging free and open

competition – a policy that favors competition in the market

place, not in the courts."), claiming that this decision was

---

[20]The Defendant claims that Hardin has been cited approvingly by
the Supreme Court.  It matters, however, how Hardin was being
cited.   Most recently, Justice O'Connor cited Hardin in her
dissent in NCUA to contrast a case where the statute concerned
competition, i.e., Hardin, from plaintiffs' case in NCUA.  NCUA,
522 U.S. at 518 (O'Connor, J. dissenting).  Justice O'Connor also
made this argument in relation to the zone of interest test,
discussed infra at 63-69, not the injury-in-fact test.  In
Defenders of Wildlife, 504 U.S. at 578, the Court noted that
cases decided around the time of, and including, Hardin "involved
Congress' elevating to the status of legally cognizable injuries
concrete, de facto injuries that were previously inadequate in
law (namely, injury to an individual's personal interest in
living in a racially integrated community, see Trafficante v.
Metro. Life Ins. Co., 409 U.S. 205, 208-212 (1972), and injury to
a company's interest in marketing its product free from
competition, see Hardin v. Kentucky Utilities Co., 390 U.S. 1, 6
(1968))."  In other words, Defenders of Wildlife recognized that
Hardin stood for the proposition that economic injuries were
cognizable and that the line of analysis upon which Defendant
relies is out of vogue.  These later cases, just like the court
here, do not read Hardin to preclude Plaintiffs' standing but to
support it.  See also Bradford Sch. Bus Transit, Inc. v. Chi.
Transit Auth., 537 F.2d 943, 946 (7th Cir. 1976); Scanwell Labs,
Inc. v. Shaffer, 424 F.2d 859, 865 (D.C. Cir. 1970).

"reversed on other grounds" by <u>Arnold Tours, Inc. v. Camp</u>, 397

U.S. 315 (1969).[21]   Def.-Int.'s Reply at 30.   The First Circuit's

decision in <u>Arnold Tours</u>, however, was not "reversed on other

grounds," it was <u>vacated</u>, <u>Arnold Tours</u>, 397 U.S. at 315,  and

therefore <u>may not be cited</u>.   Moreover, as the Supreme Court

recounted the following year when it again took up the case:

"Following our decisions last Term . . . we vacated and remanded

the case for reconsideration . . . and the Court of Appeals

reaffirmed its previous decision."   <u>Arnold Tours, Inc. v. Camp</u>,

400 U.S. 45, 46 (1970).   In this latter decision, the Court

<u>reversed</u> the First Circuit and found standing.   <u>Id.</u>  In other

words, the case upon which the Defendant-Intervenors rely was not

"reversed on other grounds" it was vacated and then, when the

Supreme Court granted certiorari again, reversed on those

grounds.   <u>See</u>, <u>e.g.</u>, Def.-Int.'s Reply at 32 n.25 (properly

noting this subsequent history in light of the District Court's

---

[21]Similarly, Defendant repeatedly relies on <u>Kan. City Power & Light Co. v. McKay</u>, 225 F.2d 924, 928 (D.C. Cir. 1955) for the proposition that where plaintiffs "have not been subjected to any obligation or duty . . . decisions of the Supreme Court . . . establish that an interest of this kind is not sufficient to enable them to sue to enjoin execution of . . . [a] program of the Government."   <u>See</u>, <u>e.g.</u>, Def.'s Supp. Br. at 15; Def.'s Reply at 21.   This, however, is a statement of the legal rights test, and has been rejected by the Supreme Court.   <u>See</u> <u>Sierra Club v. Morton</u>, 405 U.S. 727, 733 & n.4 (1972); <u>see also</u> <u>Simon v. E. Ky. Welfare Rights Org.</u>, 426 U.S. 26, 39 & n.18 (1976).

decision in <u>Arnold Tours</u>).  From this authority, and others, the First Circuit agreed eight years later that there exists "no authority for the proposition that competitive harm is an insufficient allegation of injury in fact. Quite the contrary, the cases finding allegations of competitive injury sufficient are legion."  <u>Rental Housing Ass'n v. Hills</u>, 548 F.2d 388, 389 (1st Cir. 1977).

Furthermore, Plaintiffs' claims do not rest on a constitutional right to import but on a statutory right not to have the antidumping and countervailing duties laws amended to disadvantage their access to U.S. markets (without Congress explicitly including them within the amendment); <u>cf.</u> <u>Logan v. Zimmerman Brush Co.</u>, 455 U.S. 422, 430 (1982) (canvassing extensive authority on this distinction in finding that statutes providing substantial evidence review create due process interests); <u>Warth v. Seldin</u>, 422 U.S. 490, 500 (1975) ("The actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing . . . .'") (quoting <u>Linda R. S. v. Richard D.</u>, 410 U.S. 614, 617, n.3 (1973)), rendering any argument that Plaintiffs' have no constitutional right of no relevance.  This does not mean that when Congress does create a legal right, plaintiffs do not have to demonstrate standing.  To the contrary,

the "'[statutory] broadening [of] the categories of injury that may be alleged in support of standing is a different matter from abandoning the requirement that the party seeking review must himself have suffered an injury.'" Defenders of Wildlife, 504 U.S. at 578 (quoting Sierra Club, 405 U.S. at 738).  As such, although injuries to interests that are not constitutionally protected are sufficient, "injury amounting only to the alleged violation of a right to have the Government act in accordance with law [is] not judicially cognizable." Id. at 575.

Perhaps even more importantly, Defendant's argument rests on a standing analysis that has long been rejected by the Supreme Court.  In Data Processing, the Supreme Court rejected the "legal interest" analysis which required claimants to demonstrate an injury to their legally protected rights. See, e.g., Akins, 524 U.S. at 19; Barlow v. Collins, 397 U.S. 159, 164 (1970); Panhandle Producers, 822 F.2d at 1108-09 (noting that although counterintuitive, "[c]ompetitors have a seemingly unbroken record of success in securing standing to challenge decisions involving agency licensing."). In repudiating that earlier test, the Court noted that the "'legal interest' test [went] to the merits [whereas the] question of standing is different," Data Processing, 397 U.S. at 153, and that the legal interest test conflicted with the "broadly remedial purpose" of the APA, id. at

156.    The Supreme Court's rejection of the "legal interest" analysis was absolute and unqualified. See Jonathan R. Siegel, Zone of Interests, 92 Geo. L. J. 317, 320 (2004) ("Data Processing rejected the 'legal right' test and created the now-familiar rule that Article III of the Constitution permits a plaintiff to bring suit in federal court provided the plaintiff is 'injured in fact,' without regard to whether the plaintiff has a legal right to be free from injury."); Sanford A. Church, A Defense of the "Zone of Interests" Standing Test, 1983 Duke L.J. 447, 449-52 (1983) ("Before 1968, courts used a 'legal interest' test to decide the standing of a party challenging agency action . . . The [Data Processing Court] replaced the legal interest test with the zone of interests test."); David P. Currie, Misunderstanding Standing, 1981 Sup. Ct. Rev. 41, 42 ("The Data Processing case in 1969, rejected the 'legal right' test, [and] declared in apparently general" terms that the zone of interest analysis would apply to future cases); Kenneth Culp Davis, The Liberalized Law of Standing, 37 U. Chi. L. Rev. 450, 453 (1970) ("A huge portion of the former foundation of the law of standing was thus knocked out.  The old test of 'a recognized legal interest' was specifically rejected.").  Any remnants of this analysis are now relevant only to prudential considerations in

the context of the zone of interest test discussed below.  Air Courier Conference, 498 U.S. at 524.

Defendant-Intervenors address the fact that Data Processing and its progeny rejected the legal interest analysis asserting that these cases are not controlling because they dealt only with new competitors, whereas plaintiffs' claim alleges unlawful competition from existing competitors.  Def.-Int.'s Reply at 31. This distinction, however, is unpersuasive.  Data Processing rejected the legal interest analysis in definitive terms, not only relating to new competitors.  Moreover, the distinction Defendant-Intervenors attempt to draw fails to recognize that the Plaintiffs are alleging new competitive threats as a result of Byrd Amendment distributions.  Cf. Alliance for Clean Coal, 44 F.3d at 593-94; Adams, 10 F.3d at 919;  Nat'l Coal Ass'n v. Hodel, 825 F.2d 523, 526 (D.C. Cir. 1987).  This attempted distinction is also belied by the fact that parties regularly bring suit against existing competitors in antitrust, copyright, and trade cases.  Accordingly, this distinction is of no moment.


### 3) Lack of injury-in-fact

Last, Defendant and Defendant-Intervenors assert that the Byrd Amendment has not so altered the competitive conditions for the Canadian Producers as to cause an injury-in-fact.  As noted

above, the court held a two day hearing to resolve this factual dispute. At that hearing, the court took testimony from Mr. Neal Fisher, Administrator for the North Dakota Wheat Commission, Mr. Mike Legge, President of U.S. Magnesium, Professor Janusz Alexander Ordover, Professor of Economics at New York University and Professor David John Teece, Professor of Business Administration at the Walter A. Haas School of Business at the University of California Berkeley.

At the outset on this issue, the Canadian Producers contend that the Byrd Distributions enhance the ability of affected domestic producers to compete; this alteration of the competitive environment, the Canadian Producers claim, will invariably lead to competitive injuries. More specifically, the Canadian Producers maintain, supported by the expert testimony of Dr. Ordover, that the Byrd Amendment leads to two types of harm:

> (1) "Ex Ante" Harms: The Canadian Producers claim that the Byrd Amendment encourages affected domestic producers to invest in qualifying expenditures that they would not have made but for the Byrd Amendment. Under this theory, because each prospective recipient's share of the money available for distribution is determined by its claimed qualifying expenditures, affected domestic producers have an incentive to expend resources on qualifying expenditures to increase their share of the funds available. To use a simplified example, consider the investment choice of a firm purchasing new equipment. If a firm considers purchasing equipment that will, absent the Byrd Amendment, return ninety-nine cents for every dollar invested, the firm will not invest in the new equipment as its projected investment yields a negative return. However, with the Byrd Amendment, if the

expected Byrd Distribution for this qualifying expenditure is more than one cent per dollar invested, the expected value of purchasing that equipment becomes positive, leading the firm to buy the new equipment.   The purchase of new equipment may lead to higher production, or lower marginal costs, which will adversely affect the firm's market competitors.   Accordingly, under this claim, even without Customs actually distributing money, the mere prospect of Byrd Distributions will lead to competitive investments.[22]

(2) "Ex Post" Harms: This claim is that once the Byrd Distributions are made, domestic industries can use those funds to enhance their productivity or weather turbulent economic markets.  Because the Byrd Distributions come with no strings attached, firms will make efficient business choices.  Nevertheless, the Byrd Distributions allow firms access to "free money."  This not only may lower their costs of capital, but also, lead them to make more investments than those that  their creditors otherwise would have sponsored.  For example, if there is a downturn in the market for a given product (say because of an oversupply of a commodity within a market), affected domestic producers may turn to cash reserves cumulated through Byrd Distributions to out-wait their competitors – a choice their creditors may not have approved.

Both theories are supported by either government studies or economic principles adopted by courts.  See infra at note 44.

---

[22]Plaintiffs concede that, because the North Dakota Wheat Commission and U.S. Magnesium are the only eligible affected domestic producers, this incentive structure will not apply to them. This concession may have been made in haste.  If a company is choosing between closing down operations or staying in business, the prospect of future distributions may tilt the balance in favor of staying in the market.  For example, if a company is projected to lose $10 dollars in the next fiscal year, it may decide to close its operations.  However, if the expected value of the Byrd Distributions is $10.01 dollars, it may stay in business an additional year to receive that pay off.

Defendant introduced expert testimony attempting to rebut these hypotheses.  In response to the "ex ante" analysis, Defendant's expert, Dr. Teece, argued that there is a large measure of uncertainty with regard to future Byrd Distributions. Specifically, because the money Customs holds on unliquidated entries may never be transferred from the "clearing accounts," i.e., the escrow-like accounts Customs creates for cash deposits, to "special accounts," i.e., the accounts from which distributions are then made (from the duties collected on liquidated entries), Dr. Teese opined that firms are not presently considering future allocations in their investment calculus; moreover, Dr. Teece argued, in terms of the Lumber Plaintiffs in particular because there are so many affected domestic producers vying for Byrd Distributions, each company's share will be very small thereby dissipating any incentive to invest in qualifying expenditures.

Dr. Teece also argued that the Canadian Producers' "ex post" analysis fails.  Contrasting production subsidies, i.e., subsidies for which the terms or conditions of receipt are directly or indirectly tied to productive enterprises, with pure subsidies, i.e., lump sum cash grants that may be dedicated to any purpose ("manna from heaven"), Dr. Teece opined that the Byrd Distributions are pure subsidies and can be used for any purpose.

As such, firms may use this money to diversify their investments into other markets, increase dividends, shut down their operations, or maintain larger cash reserves for use at some distant date in the future. In essence, Dr. Teece maintained, there are too many alternative ways affected domestic producers may spend their distributions to warrant any conclusion that those expenditures will have any adverse affect on the Canadian Producers.[23]

As stated above, in weighing these competing claims, the court must consider whether plaintiffs have demonstrated that their claimed injuries are probable and imminent as opposed to

---

[23]The Defendant and Defendant-Intervenors have also marshalled evidence showing that the Canadian Producers' market shares have not declined since Byrd Distributions started. This fact, however, is not relevant to the injury-in-fact inquiry. Pennell v. San Jose, 485 U.S. 1, 8 (1988) ("The likelihood of enforcement, with the concomitant probability that a landlord's rent will be reduced below what he or she would otherwise be able to obtain in the absence of the Ordinance, is a sufficient threat of actual injury to satisfy Art. III's requirement . . . ."); Hunt v. Wash. State Apple Advertising Comm'n, 432 U.S. 333, 345 (1977) ("In the event the North Carolina statute results in a contraction of the market for Washington apples or prevents any market expansion that might otherwise occur, it could reduce the amount of the assessments due the Commission and used to support its activities."); Lac Du Flambeau Band of Lake Superior Chippewa Indians, 422 F.3d 490, 498 (7th Cir. 2005); Alliance for Clean Coal, 44 F.3d at 595 ("The alleged injury stems from the fact that sales have not increased as much or as rapidly as they would have on a level playing field without the Coal Act.").

speculative or conjectural.[24]  <u>See</u>, <u>e.g.</u>,  <u>Clinton v. City of New York</u>, 524 U.S. 417, 430 (1998); <u>Defenders of Wildlife</u>, 504 U.S. at 561; <u>cf.</u> <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.</u>, 528 U.S. 167, 184 (2000) (noting that there was nothing "improbable" about plaintiffs' alleged harm).  Moreover, the injury need not be great, an identifiable trifle is sufficient, <u>i.e.</u>, there is no defense that a harm is <u>de minimus</u>.  <u>See</u> <u>United States v. SCRAP</u>, 412 U.S. 669, 689 n.14 (1973); <u>see also</u> <u>Akins</u>, 524 U.S. at 21 (finding that deprivation of information constitutes an injury because "[t]here is no reason to doubt their claim that the information would help them"); <u>accord</u> <u>Laidlaw Envtl. Servs.</u>, 528 U.S. at 186.  Moreover, although a party invoking the court's jurisdiction has the burden of proving that jurisdiction is proper, <u>see</u>, <u>e.g.</u>, <u>Defenders of Wildlife</u>, 504 U.S. at 561, that party does not have to "negate . . . speculative and hypothetical possibilities . . . in order to demonstrate the likely effectiveness of judicial relief," <u>Duke Power Co. v. Carolina Envtl. Study Group</u>, 438 U.S. 59, 78 (1978).

---

[24]Imminency is satisfied here because the Byrd Distributions are ongoing, <u>i.e.</u>, the putatively illegal governmental action being protested is occurring now.  If the court required the parties to wait until their competitors actually used the money, given the two year statute of limitations for bringing claims under 28 U.S.C. § 1581(i), requiring plaintiffs to wait until they were actually injured would deprive them of any relief.

The court further notes its agreement with Dr. Teece's assessment that because money is "completely fungible," tracing where Bryd distributions are used is a difficult, if not impossible, assignment. Testimony of Dr. Teece, Trial Transcript of March 28, 2006 Hearing at 282. Therefore, the court must consider whether, on the record here, it is likely that any of the past distributions have been, and/or likely will be, used to Plaintiff Producers' detriment.

Bearing these observations in mind, the court is persuaded by the Canadian Producers' arguments that there will likely be some injury as a result of the distributions. As this inquiry relates to Lumber Plaintiffs, Dr. Teece did not dispute that affected domestic producers may use a portion of their distributions to enhance their competitive positions. His testimony was simply that the uncertainty was too great to warrant any definitive conclusion that affected domestic producers would use any of their distributions to enhance their competitive positions. However, the fact remains that the very United States Government Accountability Office study that figured into his analysis noted that at least one firm (if not more) has used its distributions on expenditures that would likely enhance its competitive position. United States Government Accountability Office, Report to Congressional Requesters:

International Trade: Issues and Effects of Implementing the Continued Dumping and Subsidy Offset Act, 104 (2005) ("GAO Report") (noting from survey results that lumber firms used distributions to "pay debt, past qualifying expenditures, general operating expenditures, general corporate expenses, and capital investment." (emphasis added)).  Similarly, although twelve out of the thirteen recipient firms had noticed "little or no effects"[25] of the Byrd Distributions, one firm did note "positive effects."  Id. at 102.  Nor is the court convinced that future distributions will not be used in a similar fashion. Indeed, according to one group representing the domestic lumber industry, the Byrd Amendment "provides a direct cash influx for those who have been and continue to be most harmed by unfair trade, allowing such entities crucial time and capital to adapt to the unfair trade practices and maintain employment levels."  Coalition for Fair Lumber Imports, The American Lumber Industry: Enforcement of the Trade Laws Essential to the Industry, Pl.'s Ex. 32 at 37 (2005).  Such investments may occur even in periods of time where there is an "oversupply" of the commodity.  Testimony

_____

[25]Unfortunately, the GAO Study does not differentiate between little and no effect.  Little effect would justify standing whereas no effect might not.

of Dr. David John Teece, Trial Transcript of March 28, 2006 Hearing at 292. As such, it is implausible for the government to maintain that <u>none</u> of the money has been, or will be, used to alter the competitive landscape. This is certainly more than the identifiable trifle necessary to sustain standing for the Lumber Plaintiffs.

More problematic are the claims of the Canadian Wheat Board and Norsk. Neither industry is directly discussed in the GAO Report. In the case of the Canadian Wheat Board, the North Dakota Wheat Commission ("NDCW") is the single recipient of monies. The NDCW does not produce any hard red spring wheat ("HRS wheat") itself; rather the NWDC (among its other duties) promotes the sale of HRS wheat on behalf of farmers in North Dakota and sponsors research on HRS wheat. Testimony of Mr. Neal Fisher, Trial Transcript of March 27, 2006 Hearing at 14-17. Also problematic for the analysis is that the NDWC received Byrd Distributions, for the first time, in December 2005; moreover, because of this litigation, the NDWC has not earmarked the money from the distribution for any specific future use. Therefore, the NDWC does not have a track record on how it spends Byrd money nor does it have a plan on how it will spend that money, Testimony of Mr. Neal Fisher, Trial Transcript of March 27, 2006 Hearing at 28, 33. As a result, predicting the affect of this

money becomes highly problematic given that some of the ways the NDWC may spend its distributions, e.g., on research, may actually aid the Canadian Producers (so long as this expenditure has not freed up other money it would have spent on research but for the Byrd Distributions).

Similarly, U.S. Magnesium, the single beneficiary of Byrd Distributions collected from duties on Norsk's goods, has placed its previous distributions in a revolving account with its creditor. Also weighing into the consideration is that U.S. Magnesium has not, over the past two years, received substantial Byrd Distributions as a result of pending litigation over the underlying determination.

Nevertheless, the court is convinced that the Canadian Wheat Board and Norsk have standing. Although Byrd Distributions may only have trickled in over the past few years, cumulatively (and with future distributions) these monies are not necessarily insignificant. Second, the U.S. General Accountability Office's survey demonstrates that Byrd recipients have used their distributions to enhance their competitive positions. GAO Report, supra, at 66, 70, 72, 77, 84, 102-04. Although the NDWC and U.S. Magnesium may not follow suit, all that plaintiffs must show is that it is probable. Third, in the case of U.S. Magnesium, it is conceded that the Byrd Distributions do lower

its "weighted average cost of capital." Testimony of Dr. Teece, Trial Transcript of March 28, 2006 Hearing at 310-14. Such reduction of its costs of capital alters competitive conditions. See id. Likewise, although the NDWC only promotes HRS wheat, the NDWC promotion activities (with the assistance of U.S. Wheat Associates) have "help[ed] to take back market share from Canadian Wheat in specific export markets[.]" Testimony of Mr. Neal Fisher, Trial Transcript of March 27, 2006 Hearing at 38. Therefore, it is unlikely that the money will not, in any way, alter the conditions of competition.[26]

---

[26]Defendant also insists that Plaintiffs are required to demonstrate specific losses. Requiring the demonstration of actual losses would be contrary to the principle that plaintiffs need not wait until they are actually injured to have standing. See, e.g., Bryant v. Yellen, 447 U.S. 352, 367-68 (1980); Req'l Rail Reorganization Act Cases, 419 U.S. 102, 143 (1974) ("One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough." (quoting Pennsylvania v. West Virginia, 262 U.S. 553, 593 (1923)); Alabama-Tombigbee Rivers Coal., 338 F.3d at 1254. Furthermore, the effect of subsidies may not be immediately clear; rather, the full effect of a subsidy may not be felt for years. Cf. Ocean Advocates v. United States Army Corps of Eng'rs, 361 F.3d 1108, 1120 (9th Cir. 2004) amended by, rehearing denied, rehearing en banc denied,402 F.3d 846 (2005); Alliance for Clean Coal, 44 F.3d at 594 ("But the showing of specific 'lost opportunities' is neither required to establish standing nor reasonably expected under the circumstances of this case."); Lac Du Flambeau Band of Lake Superior Chippewa Indians, 422 F.3d at 498 ("the present impact of a future though uncertain harm may establish injury in fact for standing purposes."); Rental Hous. Ass'n of Greater Lynn, Inc. v. Hills, 548 F.2d 388, 389 (1st Cir. 1977) ("specific proof of competitive injury is not

(continued...)

Therefore, the court finds that the Canadian Producers meet the injury-in-fact test.[27]

### b) Causality and Redressability

Having found that the Byrd Amendment is likely to injure foreign competitors, the court next considers whether these injuries are traceable to the Byrd Amendment and whether judicial review may provide relief. In this case, these tests are easily met. Given that the Commissioner distributes such subsidies, the injury caused by these subsidies is directly traceable to the Commissioner's actions. Moreover, the injuries are redressable

---

[26](...continued)
possible, it could hardly be thought that administrative action likely to cause harm cannot be challenged until it is too late."); Westport Taxi Serv., Inc. v. Adams, 571 F.2d 697, 700-701 (2d Cir. 1978). For example, if a competitor uses the subsidy to build a new manufacturing facility, construction may take several years to be completed, and even more time to fully effect the market.

[27]The court further notes that the Defendant has acknowledged the likely effects of Byrd Distributions. In its reply brief, the Defendant argued that the Byrd Amendment "assists those United States domestic producers which have been harmed by unfair import competition," Def.'s Reply at 22, and "accomplishes the 'Findings of Congress' that the injurious effects of persistent unfair trade practices must be neutralized 'so that jobs and investment that should be in the United States are not lost through false market signals," id. at 26 (emphasis added). Note, the Defendant did not argue that is feasible that the Byrd Amendment works as designed, but rather that the Byrd Amendment does in fact work as designed. Therefore, it is disingenuous for the Defendant to now argue that plaintiffs' injuries are entirely speculative and hypothetical.

because an order enjoining such distributions will cause them to cease.

                    *                    *                    *

In sum, the court finds that the Canadian Producers have Article III standing.


*ii. Canada's Standing*

Canada argues that it has standing by virtue of the fact that it has suffered a breach of NAFTA by the United States. Canada asserts that Plaintiffs have standing to challenge breaches of contracts.[28] Canada further asserts that international agreements are (essentially) contracts between nations. See, e.g, B. Altman & Co. v. United States, 224 U.S. 583, 600 (1912). Canada avers that because the United States has violated NAFTA by (a) applying amendments to Canadian goods without the statute so specifically stating, (b) failing to

---

[28]The Defendant claims that a party's injury cannot be based on a violation of NAFTA under 19 U.S.C. § 3312(c) (discussed below). That provision, however, merely states that no person, other than the United States, shall have a cause of action based on NAFTA or Congressional approval thereof. Whether a party is injured for purposes of Article III is an entirely different inquiry than whether a party has a cause of action to bring a claim. Therefore, Section 3312(c) does not bar this injury. Cf. Air Courier Conf., 498 U.S. at 523 n.3; Republic of Para. v. Allen, 949 F. Supp. 1269, 1273 (E.D. Va. 1996) (finding standing to challenge the United States' application of a treaty but concluding that plaintiffs did not have cause of action).

consult with Canada prior to the Amendment's passage (if it does apply to Canada), and (perhaps) (c) applying an amendment to Canada that violated GATT, the United States has injured Canada within the meaning of the injury-in-fact requirement of Article III.  Pl.'s Mem. at 16 (citing Roeder v. Islamic Republic of Iran, 333 F.3d 228, 234 (D.C. Cir. 2003), Republic of Para. v. Allen, 949 F. Supp. 1269, 1273 (E.D. Va. 1996), Gov't of Jam. v. United States, 770 F. Supp. 627, 630 n.6 (M.D. Fla. 1991)).

Even assuming arguendo that breaches of a contract per se confer standing on parties to the contract, and that international agreements are "contracts," Canada's analysis has failed to account for the fact that it has already elected a remedy for this breach of its contractual obligations by pursuing, and winning, its claim before the WTO, and by receiving compensation in accordance with the WTO decision.  Although WTO adjudications may not be binding on the United States in requiring the United States to conform its regulatory law to adverse WTO decisions, see Corus Staal BV v. DOC, 395 F.3d 1343, 1347-49 (Fed. Cir. 2005), cert. denied 126 S. Ct. 1023 (2006); but see Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 386 n.24 (2000); Allegheny Ludlum Corp. v. United States, 367 F.3d 1339, 1348 (Fed. Cir. 2004), it is nonetheless clear that legal consequences flow as a result of those decisions, i.e., adverse

decisions require offending states to conform or compensate, see

Andreas F. Lowenfeld, International Economic Law 158-61 (2002).

See generally Medellin v. Dretke, 125B S. Ct. 2088, 2094 (2005)

(Ginsburg J., concurring);   La Abra Silver Mining Co. v. United

States, 175 U.S. 423, 463 (1899).   In this case, the WTO's

decision has led to compensation in the form of the suspension of

Canada's trade concessions guaranteed to the United States (in

contract parlance, garnishment of the United States' benefits

under the agreement) – a fact that this court cannot refuse to

recognize.

Alternatively, Canada claims that, despite its victory

before the WTO, NAFTA aims at achieving free trade and that the

United States' breach of NAFTA deprives Canada of this benefit.

Retaliation, Canada claims, simply does not adequately compensate

it for its contractual loses under NAFTA.[29]   But Canada's

contract analogy proves too much.   Simply because a party might

prefer an alternative remedy for a breach of contract to that

which it received does not entitle a complaining party to

additional remedies.   See, e.g., Hickson Corp. v. Norfolk S. Ry.

Co., 260 F.3d 559, 567 (6th Cir. 2001); Artis v. Norfolk & W. Ry

---

[29]NAFTA and the Uruguay Round Agreements are largely coextensive
on this matter.   See, e.g., NAFTA art. 1902.2(d).   Where, as
here, they are coextensive, a violation of one injures a party to
the same extent as a violation of the other.

Co., 204 F.3d 141 (4th Cir. 2000); Sparaco v. Lawler, Matusky, Skelly Eng'rs, LLP, 313 F. Supp. 2d 247 (S.D.N.Y. 2004) ("A plaintiff is not entitled to recover twice for the same injury."). See also Dan B. Dobbs, Law of Remedies § 9.4 (2nd ed. 1993). The WTO has provided a remedy intended to make Canada whole for its loses. See United States – Continued Dumping and Subsidy Offset Act of 2000, WT/DS234/ARB/CAN ¶ 5.2 (Aug. 31, 2004). Although an election of a remedy does not prevent a party from seeking redress for legally distinct statutory rights, see Alexander v. Gardner-Denver Co., 415 U.S. 36, 50 (1974), a party may not pursue duplicative or inconsistent remedies, see generally Artis, 204 F.3d at 146; Olympia Hotels Corp. v. Johnson Wax Dev. Corp., 908 F.2d 1363, 1371 (7th Cir. 1990) (the election of remedies seeks to prevent double recovery); Wynfield Inns v. Edward Leroux Group, Inc., 896 F.2d 483, 488-89 (11th Cir. 1990) (finding inconsistent a quantum meruit remedy and a contract remedy because the prior assumed the nonexistence of a contract where the latter presumed the existence of one). Here, if Canada prevails, the breach of the Uruguay Round Agreements will be effectively cured thereby undermining the contractual basis of the WTO's award and the compensation that Canada has thus far received. Cf. id. Therefore, by pursuing its action before the WTO, Canada has elected this remedy at the expense of others.

Furthermore, specific performance (which Canada seeks here) is generally disfavored as a remedy for a breach of contract. See, e.g., Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 211 (2002) (canvassing authority). Equity disfavors specific performance partially because it is difficult for courts to compel recalcitrant parties to perform on contracts. Trade disputes between nations are no different. The drafters of the WTO understood this concept by pragmatically placing any remedy in the hands of the non-breaching party by permitting them to garnish the offending nation's trade concessions. These were the rules of the road when Canada petitioned the WTO for redress; and this was the remedy that it could expect. Although the court can appreciate that Canada may believe that it has been denied the benefit of its original bargain, the court cannot ignore that in fact it has already been compensated for this claimed injury in accordance with the contract upon which it relies to assert standing.[30] Cf. Defenders of Wildlife, 504 U.S. at 560 (injury-

---

[30]Canada makes four additional arguments which warrant brief attention. First, Canada claims that it is seeking to enjoin future breaches of the Agreement. However, consistent with the WTO's decision, Canada may retaliate so long as the United States is in material breach of the Agreement and, therefore, Canada has an adequate remedy at law. Cf. Lyons, 461 U.S. at 112. Second, Canada claims it has standing because its statutory rights were violated. As discussed above, see supra at 43-44, the court does not adopt this view of standing. Third, Canada claims that Defendant has waived this argument. However, because this

(continued...)

in-fact is an indispensable requirement for standing which neither Congress, nor the executive, can displace).

Accordingly, the court finds that Canada lacks standing and, therefore grants Defendant's motion to dismiss in this respect.

## B. Prudential requirements

As noted above, in addition to Article III's constitutional requirements for standing, courts have imposed a further limitation for cases brought under the APA.  Recognizing the APA, this court's founding statute provides that: "[a]ny civil action of which the Court of International Trade has jurisdiction, . . . may be commenced in the court by any person adversely affected or aggrieved by agency action within the meaning of section 702 of [T]itle 5."  28 U.S.C. § 2631(i).  In turn, Title 5 section 702 (Section 10(a) of the APA), provides that "[a] person suffering legal wrong because of agency action, or adversely affected or

---

(...continued)
analysis flows from Canada's standing argument, and because standing cannot be waived, this argument must fail.  Fourth, Canada claims that the WTO did not compensate it for distributions made prior to 2004.  However, in its Complaint, Canada seeks disgorgement of distributions made only during and after 2004.  Gov't Canada Compl. 9.  Therefore, Canada has not asked the court to remedy this injury.  Accordingly, this cannot provide a basis for the injuries for which Canada seeks redress, i.e., distributions made during and after 2004.  Cf. Lyons, 461 U.S. at 102-03.  See also Lewis v. Casey, 518 U.S. 343, 357 (1996) ("standing is not dispensed in gross").

aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review." These provisions require that a party need only be "affected or aggrieved by agency action" in order to bring a claim. Accordingly, the statutes manifest "congressional intent to cast the standing net broadly -- beyond the common-law interests and substantive statutory rights upon which 'prudential' standing traditionally rested." Akins, 524 U.S. at 19. However, despite the low bar set by Article III's standing requirement, and the APA's "'generous review provisions,'" Data Processing, 397 U.S. at 156 (quoting Shaughnessy v. Pedreiro, 349 U.S. 48, 51 (1955)), "it was [never] thought . . . that Congress, in enacting § 702, had . . . intended to allow suit by every person suffering injury in fact." Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 395 (1986). Therefore, courts have "supplied [a] gloss [to the APA's language] by adding to the requirement that the complainant be 'adversely affected or aggrieved,' i.e., injured in fact, the additional requirement that 'the interest sought to be protected by the complainant [be] arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" Id. at 395-96 (quoting Data Processing, 397 U.S. at 153); Dir., Office of Workers' Compensation Programs  v. Newport News Shipbuilding & Dry Dock

Co., 514 U.S. 122, 126-27 (1995).  This is the relevant

prudential requirement for standing here.

In this case, Plaintiffs claim that the Commissioner's

interpretation of the Byrd Amendment contravenes Section 408.

Section 408, therefore, is the relevant statute under which to

conduct the zone of interest analysis.  Nat'l Wildlife Fed'n, 497

U.S. at 883 ("the plaintiff must establish that the injury he [or

she] complains of . . . falls within the 'zone of interests'

sought to be protected by the statutory provision whose violation

forms the legal basis for his complaint." (emphasis added)).  See

also Bennett, 520 U.S. at 175-76; Air Courier Conf., 498 U.S. at

523-524.[31]    According to the Supreme Court's most recent

articulation of the zone of interest test in NCUA, 522 U.S. at

492, the court must "first discern the interests 'arguably . . .

to be protected'" by Section 408, then "inquire whether the

---

[31]Defendant argues that the Byrd Amendment is the relevant
statute and that, because the Byrd Amendment seeks to assist
domestic industries, Plaintiffs' interests are inconsistent with
the Byrd Amendment.  However, as explained above, Section 408 is
an interpretative rule that applies to all amendments to the
antidumping and countervailing duty laws.  Consequently, the Byrd
Amendment, when read in conjunction with Section 408, authorizes
Customs to distribute money except from duty orders on Canadian
or Mexican goods, if those duty orders apply to goods.  It is
this explicit exception that Section 408 places on the Byrd
Amendment and upon which Plaintiffs rely.

plaintiff's interests affected by the agency action in question are among them." (internal citation omitted).

In conducting this two-part analysis, the Supreme Court has further maintained that the "zone of interest" test operates under the presumption that agency actions are subject to judicial review, and therefore, "is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff[s]." Clarke, 479 U.S. at 399-400 (footnote omitted); see also NCUA, 522 U.S. at 488-89 ("Although our prior cases have not stated a clear rule for determining when a plaintiff's interest is 'arguably within the zone of interests' to be protected by a statute, they nonetheless establish that we should not inquire whether there has been a congressional intent to benefit the would-be plaintiff."). Rather, the zone of interest test only "denies a right of review if the plaintiff's interests are . . . marginally related to or inconsistent with the purposes implicit in the statute . . . ." Clarke, 479 U.S. at 399. For the reasons explained below, it is clear that the Canadian Producers' interests are so sufficiently related to, and not inconsistent with, the purposes of Section 408 that those interests provide a basis for standing.

As noted above, Section 408 provides that "[a]ny amendment enacted after the Agreement enters into force with respect to the

United States that is made to [the antidumping and countervailing duty laws] . . . shall apply to goods from a NAFTA country only to the extent specified in the amendment." As Plaintiffs correctly note, this provision operates under the auspices of a trade regime which otherwise fosters "conditions of fair competition." NAFTA, art. 102. See generally SAA, reprinted in H. R. Doc. No. 103-159, p. 3 (1993); Sykes, supra, at 14-15. Indeed, the main purpose behind the U.S. trade laws is to regulate the level of competition between foreign and domestic producers. Cf. Zenith Radio Corp. v. United States, 437 U.S. 443, 456 (1978) (countervailing duty laws are "intended to offset the unfair competitive advantage that foreign producers would otherwise enjoy from export subsidies paid by their governments."); J.W. Hampton & Co. v. United States, 276 U.S. 394, 411 (1928) (noting a predecessor to the modern antidumping regime aimed at "protection that will avoid damaging competition to the country's industries by the importation of goods from other countries at too low a rate to equalize foreign and domestic competition in the markets of the United States."); Globe Metallurgical, Inc. v. United States, 28 CIT __,__, 350 F. Supp. 2d 1148, 1157 (2004) dismissed by 403 F. Supp. 2d 1305 (2005) ("The goal of the [antidumping] statute is not punitive; the goal is to level the playing field for United States

producers of similar goods with producers in an [other] country."). Cf. Wheatland Tube Co. v. United States, 30 CIT ___,___, Slip Op. 06-08 at 22 (Jan. 17, 2006) (Antidumping "duties are intended to offset price discrimination from overseas competitive industries."). Therefore, by imposing a "magic words" rule on future amendments, the apparent purpose of Section 408 is to protect Canadian and Mexican importers from some statutory alterations of the competitive environment contemplated by the antidumping and countervailing duty laws in effect as of January 1, 1994.

Certainly, the Canadian Producers (as importers into the United States subject to antidumping and countervailing duty orders) have an interest in seeing that the antidumping and countervailing duty laws are not statutorily adjusted to alter the level of competition contemplated by these laws without Congress making its intent to amend these laws explicit. Because Plaintiffs' interests need only be "marginally related to . . . . [the] purposes implicit in the statute," Clarke, 479 U.S. at 399, the Canadian Producers' interest in maintaining the antidumping and countervailing duty laws as they existed in 1994 falls "arguably within the zone of interests to be protected or regulated by the statute," Data Processing, 397 U.S. at 153; see also Hardin, 390 U.S. at 6 ("when the particular statutory

provision invoked does reflect a legislative purpose to protect a competitive interest, the injured competitor has standing to require compliance with that provision."). Cf. Zenith Radio Corp., 437 U.S. at 457-58 (noting the reliance interests of foreign producers on both the continuity of U.S. laws, and the adherence to international legal principles); Made in the USA Found., 242 F.3d at 1318.

Because prudential standing is satisfied when the injury asserted by a plaintiff "'arguably [falls] within the zone of interests to be protected or regulated by the statute . . . in question,'" Akins, 524 U.S. at 20 (quoting NCUA, 522 U.S. at 488), there are no prudential standing restraints to bar Plaintiffs' claims here, accord United Food & Commer. Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 555-58 (1996) (holding that Congress may dispense with prudential standing requirements).

### III. POLITICAL QUESTION DOCTRINE

Defendant also raises concern that the subject matter of the Plaintiffs' Complaints is not proper for judicial resolution. Specifically, Defendant asserts that "plaintiffs' complaints about the [Byrd Amendment] directly implicate foreign affairs and diplomacy, not matters properly addressed pursuant to the APA . .

. [and therefore] present non-justiciable political questions and must be dismissed."[32]  Def.'s Reply at 36.[33]

The political question doctrine is founded on the recognition that the federal government is composed of three branches of government, each with its own responsibilities. Under this separation of powers principle, courts have recognized

_____

[32]The court notes, by way of comparison, that Congress explicitly provided for judicial review in actions commenced by foreign governments.  For example, 28 U.S.C. § 2631(c) provides that "[a] civil action contesting a determination listed in section 516A of the Tariff Act of 1930 [19 U.S.C. § 1516a] may be commenced in the Court of International Trade by any interested party who was a party to the proceeding in connection with which the matter arose" where "[t]he term 'interested party' [includes] . . . the government of a country in which such merchandise is produced or manufactured or from which such merchandise is exported," 19 U.S.C. § 1677(9)(B).  Moreover, the legislative history of the court, as raised by Plaintiffs, evidence that "a major goal" in the creation of this Court, was the "enlargement of the class of persons eligible to sue in civil actions in the Court of International to include . . . foreign government and those who would otherwise be adversely affected or aggrieved by administrative decisions or litigation arising out of our international trade and tariff laws . . . ."  Customs Court Act of 1979: Hearing on S. 1654 Before the S. Subcomm. on Improvements in Judicial Machinery, 96th Cong. 28 (1979). Reflective of this principle, this court has entertained cases brought by foreign governments.  See, e.g., Royal Thai Gov't v. United States, 28 CIT __, 341 F. Supp. 2d 1315 (2004) aff'd in part, rev'd in part Royal Thai Gov't v. United States, 2006 U.S. App. LEXIS 2415 (Fed. Cir. Feb. 1, 2006), Gov't of Uzbekistan v. United States, 25 CIT 1084 (2001), see also Floral Trade Council v. United States, 21 CIT 1401, 991 F. Supp. 655 (1997) (wherein the Government of Colombia was a defendant-intervenor).
[33]At oral argument, Defendant told the court that it intended this argument only to apply to Canada.  However, because the Defendant referenced all plaintiffs in its briefs, the court will address the matter.

that where a subject matter is exclusively assigned to a coordinate branch, or involves questions the political branches are better-suited to answer than the judicial branch, such a subject matter is not appropriate for judicial resolution. See, e.g., Baker v. Carr, 369 U.S. 186, 211 (1962).

As properly noted by Plaintiffs, Defendant's objection raised here is similar to the one directly rejected by the Supreme Court in Japan Whaling Ass'n v. Am. Cetacean Soc., 478 U.S. 221 (1986). In Japan Whaling, plaintiffs sought a writ of mandamus to compel the Secretary of Commerce ("Secretary") to certify that the Japanese whaling industry was diminishing the effectiveness of the International Convention for the Regulation of Whaling, Dec. 2, 1946, 62 Stat. 1716, T.I.A.S. No. 1849 (entered into force Nov. 10, 1948), and, as a consequence of certification, to prohibit the importation of fish products from Japan under the Pelly Amendment to the Fishermen's Protective Act of 1967, 22 U.S.C. § 1978. Japan Whaling, 478 U.S. at 220-28. The Secretary defended the decision not to certify Japan, inter alia, on the basis of an executive agreement reached between the United States and Japan in which Japan agreed to certain harvest limits with the cessation of whaling by 1988. Id.

Before the Supreme Court, the defendant-intervenors in Japan Whaling argued that the Supreme Court was precluded by the

political question doctrine from entertaining plaintiffs' suits.

Clearly rejecting this argument, the Supreme Court held that:

> [N]ot every matter touching on politics is a political
> question . . . and more specifically, that it is "error
> to suppose that every case or controversy which
> touches foreign relations lies beyond judicial
> cognizance." [Baker v. Carr, 369 U.S. 186, 211 (1969)].
> The political question doctrine excludes from judicial
> review those controversies which revolve around policy
> choices and value determinations constitutionally
> committed for resolution to the halls of Congress or
> the confines of the Executive Branch. The Judiciary is
> particularly ill suited to make such decisions, as
> "courts are fundamentally underequipped to formulate
> national policies or develop standards for matters not
> legal in nature." United States ex rel. Joseph v.
> Cannon, 642 F.2d 1373, 1379 (1981) (footnote omitted),
> cert. denied, 455 U.S. 999 (1982).
>
> As Baker plainly held, however, the courts have the
> authority to construe treaties and executive
> agreements, and it goes without saying that
> interpreting congressional legislation is a recurring
> and accepted task for the federal courts. It is also
> evident that the challenge to the Secretary's decision
> not to certify Japan for harvesting whales in excess of
> IWC quotas presents a purely legal question of
> statutory interpretation. The Court must first
> determine the nature and scope of the duty imposed upon
> the Secretary by the Amendments, a decision which calls
> for applying no more than the traditional rules of
> statutory construction, and then applying this analysis
> to the particular set of facts presented below. We are
> cognizant of the interplay between these Amendments and
> the conduct of this Nation's foreign relations, and we
> recognize the premier role which both Congress and the
> Executive play in this field. But under the
> Constitution, one of the Judiciary's characteristic
> roles is to interpret statutes, and we cannot shirk
> this responsibility merely because our decision may
> have significant political overtones. We conclude,
> therefore, that the present cases present a justiciable

controversy, and turn to the merits of petitioners'
arguments.

Japan Whaling, 478 U.S. at 229-30 (emphasis added).

The issues presented in Plaintiffs' case here are even more appropriate for judicial resolution than those in Japan Whaling. First, like plaintiffs' suit in Japan Whaling, Plaintiffs here are seeking enforcement of Customs' non-discretionary statutory obligation under Section 408. Cf. Vieth v. Jubelirer, 541 U.S. 267, 278 (2004) (finding that the political question doctrine applies where there are no "standards" or "rules" to apply, and where no decision that is "principled, rational, and based upon reasoned distinctions," can be rendered."); Nixon v. United States, 506 U.S. 224, 228-29 (1993).

Second, in Japan Whaling the Secretary was responsible for determining whether the Japanese whaling industries were "diminish[ing] the effectiveness of an international fishery conservation program," Japan Whaling, 478 U.S. at 225; not a very precise standard. In contrast, here, neither the Byrd Amendment nor Section 408 require any level of judgment call – the terms of the Byrd Amendment and Section 408 are clear and unqualified.

Third, because Japan Whaling involved matters of foreign relations where the President has inherent authorities, U.S.

Const. art. II, §§ 2-3; <u>United States v. Curtiss-Wright Exp.</u> <u>Corp.</u>, 299 U.S. 304, 320 (1936), the principles announced therein must be applicable in the arena of foreign commerce where the Constitution grants Congress plenary authority, <u>see</u>, <u>e.g.</u>, U.S. Const. art. I, § 8; <u>Barclays Bank PLC v. Franchise Tax Bd. of</u> <u>Cal.</u>, 512 U.S. 298, 324 (1994); <u>Itel Containers Int'l Corp. v.</u> <u>Huddelston</u>, 507 U.S. 60, 85 (1993) (Blackmun, J. dissenting) ("The constitutional power over foreign affairs is shared by Congress and the President . . . but the power to regulate commerce with foreign nations is textually delegated to Congress alone." (citations omitted)).    Cf. <u>Nat'l Cable Television Ass'n</u> <u>v. United States</u>, 415 U.S. 336, 340 (1974) ("Taxation is a legislative function, and Congress . . . is the sole organ for levying taxes"); <u>Office of Pers. Mgmt. v. Richmond</u>, 496 U.S. 414, 424 (1990) ("Our cases underscore the straightforward and explicit command of the Appropriations Clause. 'It means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress.'" (quoting <u>Cincinnati Soap</u> <u>Co. v. United States</u>, 301 U.S. 308, 321 (1937))).  Cf. <u>Baker</u>, 369 U.S. at 217 (the political question doctrine applies when there exists a "textually demonstrable constitutional commitment of the issue to a coordinate political department").  Indeed, when the President exercises authority in regulating foreign commerce, he

or she does so as Congress' "agent."  Field v. Clark, 143 U.S. 649, 692-94 (1892); see also Fed. Energy Admin. v. Algonquin SNG, Inc., 426 U.S. 548, 558-60 (1976); J.W. Hampton Jr., & Co. v. United States, 276 U.S. 394, 406-410 (1928);  B. Altman, 224 U.S. at 602.  Consequently, Customs is in no way authorized to avoid compliance with statutory law under the guise of international diplomacy.  See  Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587-89 (1952) (President not authorized to seize steel factory to secure production of war materials); United States v. Guy W. Capps, Inc., 204 F.2d 655, 659-60 (4th Cir. 1953) ("whatever the power of the executive with respect to making executive trade agreements regulating foreign commerce in the absence of action by Congress, it is clear that the executive may not through entering into such an agreement avoid complying with a regulation prescribed by Congress."); accord United States v. Yoshida Int'l, Inc., 526 F.2d 560, 572 (C.C.P.A. 1975) (noting that the President has no independent authority over foreign commerce).

Therefore, the decision in Japan Whaling precludes applying the political question doctrine to bar Plaintiffs' suits here.

Accordingly, this matter is not barred by the political question

doctrine.[34]


## IV. CAUSE OF ACTION

Defendant and Defendant-Intervenors also assert that U.S.

law does not confer on Plaintiffs a cause of action for the

complaints in this action.  Def.'s Reply at 3, Def.-Int.'s Reply

at 7.  As noted above, Plaintiffs claim a right of action under

the APA, 5 U.S.C. § 702, which presumptively provides judicial

review of final agency actions.  See 5 U.S.C. § 701(a);  Bowen v.

Mich. Acad. of Family Physicians, 476 U.S. 667, 670 (1986)

(noting a "strong presumption that Congress intends judicial

review of administrative action");  accord Block v. Cmty.

Nutrition Inst., 467 U.S. 348, 349 (1984);  Abbott Labs. v.

Gardner, 387 U.S. 136, 140-41 (1967).  Nonetheless, this strong

presumption in favor of reviewability, may be "overcom[e]

whenever the congressional intent to preclude review is 'fairly

discernible in the statutory scheme,'"  Block, 467 U.S. at 351

(quoting Data Processing, 397 U.S. at 157);  accord Abbott Labs.,

387 U.S. at 141 (the presumption may be overcome by "clear and

convincing evidence.").

---

[34]Of, and to the extent, Defendant also raises this challenge
pursuant to the APA, that argument was also rejected by the
Supreme Court on the same basis in Japan Whaling.

In Block, the Supreme Court identified five types of evidence courts consider in determining whether judicial review is precluded:

> (1) specific statutory language, (2) specific legislative history, (3) contemporaneous judicial construction followed by Congressional acquiescence, (4) the collective import of the legislative and judicial history of the statute, and (5) inferences drawn from the statutory scheme as a whole.

III Richard J. Pierce, Jr., Administrative Law Treatise § 17.8 (4th ed. 2002) (citing Block, 467 U.S. at 349 (1983)); accord United States v. Fausto, 484 U.S. 439, 444 (1987) (courts examine "the purpose [of the law], the entirety of its text, and the structure of review that it establishes."). Of particular importance to this inquiry is whether judicial review would frustrate the statutory objectives of the NAFTA Implementation Act. See, e.g., Califano v. Sanders, 430 U.S. 99, 108 (1977); accord Switchmen's Union of N. Am. v. Nat'l Mediation Bd., 320 U.S. 297, 304 (1943); Morris v. Gressette, 432 U.S. 491, 499-507 (1977).

In this case, Defendant-Intervenors point to Section 102(c) of the NAFTA Implementation Act, codified at 19 U.S.C. § 3312(c), which provides that "[n]o person other than the United States . . . shall have any cause of action or defense under . . . the Agreement or by virtue of Congressional approval thereof[.]" 19

U.S.C. § 3312(c) (emphasis added).  Defendant-Intervenors claim that this provides "specific statutory language" barring Plaintiffs' suits.  See also 5 U.S.C. § 701(a) (the APA provides judicial review except where "statutes preclude judicial review").  Alternatively, the Defendant proposes that the NAFTA Implementation Act (more generally) evidences Congressional intent to foreclose judicial review.  Each argument will be addressed in turn.

  1. *"Approval Thereof" Does Not Extend to Implementing Legislation*

Defendant-Intervenors assert that the words "Congressional approval thereof" includes the passage of the implementing legislation, and that therefore neither the Agreement nor any of the provisions incorporated into U.S. law with the passage of the implementing legislation provide a cause of action.  Def. Int.'s Resp. at 8.  Under Defendant-Intervenors' theory, the NAFTA Implementation Act approved NAFTA, and by consequence of this approval, implemented the Agreement.  The "fast track" process meant that Congress approved and enacted such agreements through a single vote.  Id.  Accordingly, Defendant-Intervenors claim, Congress could not have intended there to be rights of action stemming from the implementing legislation.  Id.  Therefore, so

the argument goes, the bar on rights of action extends to actions such as this one which is based on the implementing legislation. Specifically, even though Plaintiffs' actions are brought pursuant to Section 408 of the NAFTA Implementation Act, 19 U.S.C. § 3438, Defendant-Intervenors argue that Plaintiffs' actions are foreclosed.

There are three reasons this argument fails: (1) the text and history of the NAFTA Implementation Act refute this theory; (2) general principles of foreign relations law distinguish between approving an international agreement and the passage of legislation implementing that agreement; and (3) such a reading would produce absurd results.

**(A) The text and history of the NAFTA Implementation Act refute this theory**

First, the text and history of the NAFTA Implementation Act establish that Congress' reference to the "approval of the Agreement" does not include <u>enactment of the Implementation Act</u>. Accordingly, the text and history of the NAFTA Implementation Act clearly refute Defendant-Intervenors' theory.

As noted above, the NAFTA Implementation Act was enacted under the legislative procedure referred to as "fast track."  <u>See</u>

19 U.S.C. § 2191 et seq.; see also 19 U.S.C. § 2901 et seq.[35] The "fast track" legislation recognized the complementary constitutional division of power between the executive and Congress in the area of foreign commercial agreements. Because constitutional authority over foreign commerce is exclusively granted to Congress, U.S. Const. art. I, § 8, but the authority to negotiate commercial agreements with foreign nations is vested in the President, U.S. Const. art. II, § 2, the President and Congress agreed to a procedure that would co-ordinate their respective responsibilities to a common, rather than a conflicting, end.  The result was the passage of legislation, establishing the "fast track," wherein Congress authorized the President to negotiate trade agreements within certain parameters, while agreeing to expeditious consideration of, and an up-or-down vote on, any agreements and on the legislation proposed to implement those agreements. See  19 U.S.C. § 2191 et seq.; 19 U.S.C. § 2901 et seq.

As is relevant here, "fast track" required that before any trade agreement "entered into force," the President would submit to Congress three separate documents: (i) the text of the

_____

[35]The version of "fast track" authority employed for the passage of NAFTA expired in 1994.  The current version of "fast track," called "Bipartisan Trade Promotion Authority Act," was adopted by Congress in 2002.  See 19 U.S.C. § 3801 et. seq. (West Supp. 2005).

agreement, (ii) the implementing legislation, and (iii) a statement of administrative action. 19 U.S.C. § 2903(a)(1)(B),(i)-(iii);[36] see also 19 U.S.C. § 2191(b)(1)(A).[37]

---

[36]Title 19 Section 2903(a) provides in relevant part:

> Implementation of trade agreements
>     (a) In general.
>         (1) Any agreement entered into under [19 U.S.C. § 2902(b) or (c)] shall enter into force with respect to the United States if (and only if)--
>             (A) the President, at least 90 calendar days before the day on which he enters into the trade agreement, notifies the House of Representatives and the Senate of his intention to enter into the agreement, and promptly thereafter publishes notice of such intention in the Federal Register;
>             (B) after entering into the agreement, the President submits a document to the House of Representatives and to the Senate containing a copy of the final legal text of the agreement, together with--
>                 (i) a draft of an implementing bill,
>                 (ii) a statement of any administrative action proposed to implement the trade agreement, and
>                 (iii) the supporting information described in paragraph (2); and
>             (C) the implementing bill is enacted into law.

[37]Title 19 Section 2191(b) provides, in relevant part:

> Definitions. For purposes of this section--
>     (1) The term "implementing bill" means only a bill of either House of Congress which is introduced as provided in subsection (c) . . . , submitted to the House of Representatives and the Senate under[19 U.S.C. § 2112, 19 U.S.C. § 3572 or 19 U.S.C. § 3805(a)(1)] and which contains--
>         (A) a provision approving such trade agreement or

(continued...)

Significantly, any agreement could only enter into force after the implementing bill was "enacted" into law.   19 U.S.C. § 2903(a)(1)(C).   This provision recognized and protected Congress' authority over legislation implementing any agreement.  The clear requirement under "fast track" that three separate documents be submitted to Congress shows the intention that approval of the agreement is distinct from the instrument of legislation implementing that agreement.

Following this "fast track" framework, in passing the NAFTA Implementation Act, see 19 U.S.C. § 3311(a), Congress: (1) approved NAFTA (thereby approving the United States' international legal obligations specified by the Agreement); (2) approved the statement of administrative action;[38] and (3)

---

(...continued)
> agreements or such extension,
> (B) a provision approving the statement of
> administrative action (if any) proposed to
> implement such trade agreement or agreements, and
> (C) if changes in existing laws or new statutory
> authority is required to implement such trade
> agreement or agreements or such extension,
> provisions, necessary or appropriate to implement
> such trade agreement or agreements or such
> extension, either repealing or amending existing
> laws or providing new statutory authority.

[38]The Statement of Administrative Action was the Executive Branch's proposal on how it would implement the Agreement, see 19 U.S.C. § 2903(a)(1)(B)(ii), 19 U.S.C. § 3311(a)(2), which was specifically and separately approved by Congress, 19 U.S.C. § 3311(a)(2); cf. 19 U.S.C. § 3512(d) (noting that the SAA for the
(continued...)

amended the statutory law of the United States to conform to NAFTA. That Congress considered these three distinct actions is best evidenced by Section 101(a) of the NAFTA Implementation Act, codified at 19 U.S.C. § 3311(a), in which Congress "approve[d]" separately – "(1) the North American Free Trade Agreement entered into on December 17, 1992, with the Governments of Canada and Mexico and submitted to the Congress on November 4, 1993; and (2) the statement of administrative action proposed to implement the Agreement that was submitted to the Congress on November 4, 1993." Noticeably absent from this "approval" was mention of the implementing legislation itself. Equally significant, regarding the third requirement, the Statement of Administrative Action, Congress separately noted its approval of the Statement of Administrative Action and (therefore) did not consider approval of the Agreement to include, in and of itself, approving anything more than the Agreement. See SAA, reprinted in H. R. Doc. No. 103-159, p. 5 (1993) ("Section 101(a) of the bill provides Congressional approval for the NAFTA and this Statement.").

As is apparent from both the "fast track" process and Section 101(a) of the NAFTA Implementation Act, Congress

_____

(...continued)
Uruguay Round Agreements Act is the "authoritative expression" of the United States concerning the interpretation of the Uruguay Round Agreements Implementation Act).

considered the implementation of the Agreement to be separate from, and not a part of, the "approval" of the Agreement itself. Therefore, when Congress employed the term "approval thereof" in Section 102(c), it meant to encompass only its approval of the Agreement, see SAA, reprinted in H. R. Doc. No. 103-159, p. 13-14 (1993) ("The prohibition of a private right of action based on the NAFTA, or on Congressional approval of the agreement in section 101(a) . . . ." (emphasis added)), and did not bar actions brought under the implementing legislation, see SAA, reprinted in H. R. Doc. No. 103-159, p. 13 (1993) ("Section 102(c) of the implementing bill precludes private right of action or remedy against a federal, state or local government, or against a private party, based on the provisions of the NAFTA or of the labor or environmental supplemental agreements." (emphasis added)).

This reading is supported by the fact that Congress knew how to refer to the implementation of the Agreement when it so intended. See, e.g., North American Free Trade Agreement Implementation Act, Pub. L. 103-82, 107 Stat 2057, Preamble ("A Bill To Implement the North American Free Trade Agreement"); Section 1 (noting that the Act may be cited as the North American Free Trade Agreement Implementation Act); Section 101(b)(1)(A) (if the President determines that "such country has implemented

the statutory changes" he may exchange notes with Canada and Mexico providing for entry into force of NAFTA); Section 101(b)(1)(B)(ii) (the President must provide to Congress a report on how Canada and Mexico have ensured the "effective implementation of the binational panel review process"); Section 202(a)(1) ("For purposes of implementing the tariff treatment"). This is especially compelling here where Congress was required to "enact," not "approve," the implementing legislation.  Compare 19 U.S.C. § 2903(a)(1)(C) (an agreement will enter into force only after "the implementing bill is enacted into law") with Pub. L. 103-82, 107 Stat 2057 ("A Bill To Implement the North American Free Trade Agreement.  Be it enacted . . ."); cf. 1 U.S.C. § 101 ("The enacting clause of all Acts of Congress shall be in the following form: 'Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled.'"); H.R. Rep. No. 103-826 at 25 (1994) ("This treatment is also consistent with the Congressional view that necessary changes in Federal statutes should be specifically enacted, not preempted by international agreements.").  Given that Congress has demonstrated that it knows how to refer to implementing legislation, the court cannot conclude that "approval of the Agreement" means, or extends to, barring actions under the implementing legislation itself.  Cf. EEOC v. Arabian

Am. Oil Co., 499 U.S. 244, 258 (1991) (evidence that Congress used express language in other statutory provisions sufficient to satisfy that the presumption against extraterritoriality had not been overcome); Dole Food Co. v. Patrickson, 538 U.S. 468, 476 (2003) (evidence that Congress used different language in other statutory provisions did not upset reliance on using corporate law principles in construing the Foreign Sovereign Immunities Act). Therefore, both the text and history of the NAFTA Implementation Act indicate that Congress did not intend the "approval thereof" language of Section 102(c) to bar Plaintiffs' action. Accordingly, because Plaintiffs' cause of action is based on the Implementation Act, and not on the Agreement, the cause of action is not barred by 19 U.S.C. § 3312 (c).

**B. "Approval" is also separate from implementation legislation when viewed in context of foreign relations law**

The court's reading of § 102(c) of the NAFTA Implementation Act is confirmed when the term "approval" is viewed in the context of U.S. foreign relations law. The word "approval," used for Congressional-executive agreements, is the equivalent to the word "ratification" used for treaties, and does not extend to separate legislative enactment. See, e.g., Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 415 (2003) ("the President has authority

to make 'executive agreements' with other countries, requiring no ratification by the Senate or approval by Congress, this power having been exercised since the early years of the Republic."); Lord McNair, The Law of Treaties 130 (1961) (Ratification means "loosely and popularly, the approval of the legislature or other State organ whose approval may be necessary.").

Primarily, an international agreement, be it a treaty or a congressional-executive agreement, creates legal obligations on the international level. Cf. Vienna Convention on the Law of Treaties, 8 I.L.M. 679 (1969) at Article 2(b) ("[R]atification", "acceptance", "approval" and "accession" mean in each case the international act so named whereby a State establishes on the international plane its consent to be bound by [an international agreement]."). Secondarily, a treaty may be self-executing upon ratification. See Foster v. Neilson, 27 U.S. (2 Pet.) 253, 314 (1829) ("Our Constitution declares a treaty to be the law of the land . . . [it is regarded as] equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provision."). When this is the case, the treaty acts in the same manner as an Act of Congress. See, e.g., Medellin v. Dretke, 125B S. Ct. 2088, 2103 (2005) (O'Connor, J. dissenting) (noting that Article 36 of the Vienna Convention on Consular Relations was self-executing); Volkswagenwerk

Aktiengesellschaft v. Schlunk, 486 U.S. 694, 699 (1988) (holding that the Hague Service Convention is self-executing); Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. 243, 252 (1984) (finding the Warsaw Convention self-executing). Thirdly, just like domestic statutes, agreements may also create private rights of action whereby private parties may enforce the agreement in courts. See Jogi v. Voges, 425 F.3d 367, 376-85 (7th Cir. 2005); Louis Henkin, Foreign Affairs and the United States Constitution 176-230 (2nd ed. 2002).

As noted, only some treaties embrace the second and third attributes, i.e., only some treaties, after ratification, may be self-executing and may create private rights of action; when they do not, Congress must separately enact legislation to implement any agreement if it wants to give the agreement effect under U.S. law. This analysis is equally applicable to congressional-executive agreements, see, e.g., B. Altman & Co. v. United States, 224 U.S. 583, 601 (1912), and executive agreements, see, e.g., Garamendi, 539 U.S. at 415-17; Dames & Moore v. Regan, 453 U.S. 654, 679 (1981), which, with certain limitations, are treated the same as treaties under the law, see, e.g., Weinberger v. Rossi, 456 U.S. 25 (1982); B. Altman & Co., 224 U.S. at 602; cf. Restatement (Third) The Foreign Relations Law of the United States ¶ 301 (1990), Vienna Convention on the Law of Treaties,

supra, at Article 2(a), Made in the USA Found. v. United States, 242 F.3d 1300, 1314 (11th Cir. 2001).

Accordingly, when using the term "approval" in Section 101(a), Congress was only speaking to its consent to the "ratification" of the Agreement under international law. Therefore, when Congress again used the term "approval" in Section 102(c), it did so to make abundantly clear that no act taken by the United States, i.e., neither the Agreement or Congress' consent thereto, would create a right of action under NAFTA itself. Cf. Hal Shapiro & Lael Brainard, Trade Promotion Authority Formerly Known as Fast Track: Building Common Ground on Trade Demands More Than a Name Change, 35 Geo. Wash. Int'l L. Rev. 1, 13 (2004) ("Congressional approval of an agreement, rather, has the effect of giving the United States new obligations under international law, but the implementing bill defines the domestic application of the agreement.").

Apart from merely approving the Agreement however, Congress has separately implemented portions of that Agreement by enacting specific provisions into domestic law. SAA, reprinted in H. R. Doc. No. 103-159, p. 1 (1993) ("The bill approves and makes statutory changes required or appropriate to implement the Agreement." (emphasis added)); Corrpro Cos. v. United States, 433 F.3d 1360, 1361 (Fed. Cir. 2006) (noting that Section 102(c)

approved <u>and</u> implemented NAFTA).  Accordingly, Section 102(c) does not foreclose rights of action under this latter enactment by Congress, <u>i.e.</u>, the NAFTA Implementation Act and specifically Section 408, 19 U.S.C. § 3438.

**(C) Absurd Results**

Defendant-Intervenors' argument would also have perverse consequences.  For example, 19 U.S.C. §§ 3331 & 2 provide duty free treatment when an import originates in the territory of a NAFTA nation.  Section 3332 was part of the NAFTA Implementation Act.  Suppose Customs blatantly ignored Section 3332 despite the importer's protests, and commenced a collection action under 19 U.S.C. § 1592(d) to collect duties at the pre-NAFTA level; were Section 102(c) to be read to bar the recognition of a cause of action or <u>defense</u> under the Implementation Act, the importer would have no defense under 19 U.S.C. §§ 3331 & 2.  Alternatively, if Defendant-Intervenors were correct, a person could not bring a protest under 19 U.S.C. § 1514(a), to contest a Customs' determination which improperly interpreted any amendment

to the Harmonized Tariff Schedule of the United States ("HTSUS")

based on NAFTA.[39]

Similarly, if Defendant-Intervenors' theory were correct,

Defendant-Intervenors themselves would not be able to assert a

Section 102(c) defense here because Section 102(c) is part of the

enabling legislation, and Defendant-Intervenors are private

[39]Section 102(c) does not discriminate between rights of action
under the APA or any other statutory provision; therefore, the
same result must obtain regardless of which statutory provision
plaintiffs invoke as the basis of their cause of action. See
Fausto, 484 U.S. at 443 (finding actions foreclosed under
numerous statutory provisions, including, but not limited to, the
APA); Lopez v. United States, 309 F. Supp. 2d 22, 27 (D.D.C.
2004) (finding that claims under NAFTA were barred under "any
provision of law"). Customs appears to suggest that actions may
be brought to enforce the HTSUS, which it argues, is analytically
different than the implementing legislation. Customs' argument
fails to take into account that the HTSUS consists of: (a)
Congressionally enacted provisions as of 1989; (b)statutory
amendments since 1989; and (c) "[e]ach modification or change
made to the Harmonized Tariff Schedule by the President under
authority of law." 19 U.S.C. § 3004(c)(1); see also United
States v. Haggar Apparel Co., 526 U.S. 380, 388-89 (1999).
Significantly, at the core of the HTSUS, exists the recognition
that the President may be authorized to "proclaim" changes to the
HTSUS "to effect the import treatment necessary or appropriate to
carry out, modify, withdraw, suspend, or terminate, in whole or
in part, trade agreements." 19 U.S.C. § 3004(c)(2)(A) (emphasis
added). In regard to NAFTA, Congress explicitly provided the
President authority to proclaim changes to the HTSUS necessary or
appropriate in effecting deals reached as a result of the NAFTA
negotiations. See, e.g., 19 U.S.C. §§ 2902, 3332(q). In sum,
not only are the changes to the HTSUS made pursuant to the NAFTA
Implementation Act, but also, the fact that Customs' recognizes
that such proclamations may give rise to causes of actions
underscores that Congress did not intend to foreclose private
actions brought under provisions implementing the NAFTA
Agreement.

parties. Therefore, their own defense, based on Section 102, would preclude private parties from raising defenses under the implementing legislation (which includes Section 102(c)). This would frustrate the very objectives of that provision.

Likewise, the United States agreed in NAFTA to amend its statutory law to conform with the Agreement. That domestic law was to be modified demonstrates the importance that the new statutory provisions and amendments would have in protecting the rights of the NAFTA parties and their exporters. See, e.g., 19 U.S.C. § 3311(b)(1)(A) (requiring the President to assure that NAFTA parties "implemented the statutory changes necessary to bring that country into compliance with its obligations" before exchanging notes of approval). Hence, the Defendant-Intervenors' argument cannot be sustained.

*                        *                        *

The court appreciates that the conclusion reached here is contrary to that reached by Judge Coyle in Bronco Wine Co. v. U.S. Dep't of Treasury, 997 F. Supp. 1318, 1322 (E.D. Cal. 1997)[40] which held that the enabling legislation of the Uruguay

_____

[40]Defendant-Intervenors note that this decision was affirmed by Bronco Wine Co. v. BATF, 1999 U.S. App. Lexis 2130 (9th Cir. 1999). The Ninth Circuit's decision was unpublished. Pursuant to the Ninth Circuit's rules, "[u]npublished dispositions and orders of this Court are not binding precedent . . . [and generally] may not be cited to or by the courts of this circuit .
(continued...)

Rounds Agreement Acts, 19 U.S.C. § 3512(c), did not create a right of action under the APA. Nevertheless, the United States' judiciary is specifically divided into circuits to foster thoughtful discussion of law, while providing uniformity through appellate review by the Supreme Court.

*2. Implication*

Alternatively, the Defendant claims that this case is "in reality" a claim under NAFTA. Def.'s Reply at 5,6. Given that it is "fairly discernible" that Congress meant to foreclose any NAFTA claim, Defendant claims, judicial review is foreclosed here. Id. The Defendant also argues that some provisions of the NAFTA Implementation Act are meant only to ensure promises to the

_____

(...continued)
. . ." Hart v. Massanari, 266 F.3d 1155, 1159 (9th Cir. 2001) (quoting Ninth Cir. R. 36-3). Accordingly, this court will not attribute weight to the Ninth Circuit's affirmation of the district court.

Moreover, other courts have relied upon the NAFTA Implementation Act in reviewing agency actions. Xerox Corp. v. United States, 423 F.3d 1356, 1364 (Fed. Cir. 2005); see also Miss. Poultry Ass'n v. Madigan, 31 F.3d 293, 303 (5th Cir. 1994); but cf. Timken Co. v United States, 354 F.3d 1334 (Fed. Cir. 2004) (noting in dicta that Section 3512(c) bars actions "against the government on the ground that Commerce acted inconsistently with the Uruguay Round Agreements Act" but then deciding that Commerce (properly) applied Section 229(b) of the Uruguay Rounds Agreement Act, codified at 19 U.S.C. § 1677(35)(A)).

NAFTA party governments, and therefore, implicitly exclude private parties from raising claims thereunder.

"In reality," however, the Plaintiffs' claims are advanced under an Act of Congress, 19 U.S.C. § 3438, See 19 U.S.C. 3312(a)(2) ("Nothing in this Act shall be construed . . . to amend or modify any law of the United States . . . unless specifically provided for in this Act."), not the Agreement itself, cf. Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 386 n.24 (2000) (rejecting a similar argument in relation to the Uruguay Round Agreements Act in using WTO proceedings as evidence in construing an Act of Congress); NSK Ltd. v. United States, 29 CIT __,__ n.6, 346 F. Supp. 2d 1312, 1322 n.6 (2004). Therefore, the proper focus of the inquiry is not whether claims under NAFTA are permissible, but rather, whether Congress foreclosed judicial review under Section 408.

Here, Congress' intent to foreclose claims brought under NAFTA does not implicate claims brought under Section 408. Indeed, because Congress made explicit its foreclosure of rights of action under the Agreement, its failure to explicitly foreclose rights under the implementing legislation itself indicates that Congress intended to permit rights of action under that implementing legislation. Cf. Amgen, Inc. v. Smith, 357 F.3d 103, 112-113 (D.C. Cir. 2004). The Supreme Court has

repeatedly held that the reverse is true, i.e., that when Congress explicitly authorizes rights of actions for some claims but not others, no right of action exists for those claims not so enumerated.  See, e.g., Fausto, 484 U.S. at 448-49; United States v. Erika, Inc., 456 U.S. 201, 208 (1982); Switchmen's Union of N. Am., 320 U.S. at 305-306.   It seems apparent to the court that this principle must also mean that Congressional foreclosure of some causes of action implies that others are appropriate for judicial review.  This conclusion also follows from the APA's strong presumption in favor of judicial review, cf. Abbott Labs., 387 U.S. at 140 ("The question is phrased in terms of 'prohibition' rather than 'authorization.'"), and from the generous statutory provision of standing for complaining parties, see 28 U.S.C. § 2631(i) (permitting causes of action to enforce the administration of trade laws).  In sum, there can be no indirect prohibition precluding review here.

Defendant's argument that Congress excluded the right of private parties to enforce obligations owing to their governments is also unpersuasive for the same reasons.[41]   Section 408

_____

[41]Interestingly, the United States' obligation to consult with Canada and Mexico prior to any amendment was not part of the NAFTA Implementation Act.  In other words, those obligations that were truly sovereign in nature were simply not included as part of the implementing legislation.  Moreover, U.S. trade laws have long recognized private rights of action based on U.S.

(continued...)

provides meaningful procedural protections to both the Government of Canada and to its private exporters. Both benefit from the forebearance promised by Section 408.

In addition, Defendant has failed to explain how Plaintiffs' actions would frustrate the legislation's statutory objectives. Neither the Byrd Amendment, nor Section 408, are discretionary in nature, cf. Webster v. Doe, 486 U.S. 592 (1988) (the CIA Director's authority to discharge employees, when it was necessary or advisable "exude[d] deference"); United States v. George S. Bush & Co., 310 U.S. 371, 380 (1940) (delegating the President authority to make "necessary or appropriate" modifications to the tariff schedule precluded judicial review); nor would allowing rights of action frustrate Customs' deliberative process because there is none in this matter; Customs' duty is non-discretionary, cf. Switchmen's Union of. N. Am., 320 U.S. at 305-306 (finding that the National Mediation Board was intended to be a referee of explosive and pressing matters, rendering judicial review of its decision

---

(...continued)
obligations owed to foreign sovereigns. See, e.g., B. Altman & Co. v. United States, 224 U.S. 583, 601 (1912); Field v. Clark, 143 U.S. 649, 690-94 (1898); accord Oldfield v. Marriott, 51 (10 How.) U.S. 146, 161 (1851). Of course, trade agreements exist for the benefit of importers and exporters.

inappropriate).     Indeed,   Section   408's   emphatic   terms

specifically provide for, rather than against, enforcement.


## V. MERITS

Having satisfied itself that jurisdiction exists, and that

the Canadian Producers have a cause of action, the court turns to

the merits.

As discussed above, Section 408 provides that:

Any amendment enacted after the Agreement enters into
force with respect to the United States that is made
to--
    (1) section 303 or title VII of the Tariff Act of
    1930 [19 U.S.C. §§ 1671 et seq.], or any successor
    statute, or
    (2) any other statute which--
            (A) provides for judicial review of final
            determinations under such section, title, or
            successor statute, or
            (B) indicates the standard of review to be
            applied,

shall apply to goods from a NAFTA country only to the
extent specified in the amendment.


Section 408, however, is not of universal applicability with

respect to any amendment passed by Congress that could alter U.S.

laws with respect to NAFTA parties.    Rather, it applies only

where: (1) Congress has enacted an amendment to specific and

particular laws; (2) that amendment was enacted after NAFTA

entered into force; (3) only in instances where any administering

authority is applying that amendment to goods from a NAFTA country; and (4) the amendment is silent on its applicability to goods from Canada and/or Mexico.

In this case, the Byrd Amendment amended title VII of the Tariff Act of 1930, see 114 Stat. 1549, 1549A-72; Congress enacted the Byrd Amendment after NAFTA entered into force with respect to the United States, id.; and the Byrd Amendment fails to specify its applicability to Canada or Mexico, id. Moreover, the Byrd Amendment, unless read in conjunction with Section 408, amended the antidumping and countervailing duty laws with respect to trade remedies imposed upon goods that have entered into the United States from Canada and Mexico.

Despite the fact that the plain language of Section 408 appears to mandate that Customs should not apply the Byrd Amendment to goods from Canada or Mexico, Defendant and Defendant-Intervenors insist (1) that because the Byrd Amendment relates to proceeds of antidumping and countervailing duty orders, its does not "apply to goods" from Canada or Mexico; (2) the Byrd Amendment supersedes Section 408; and (3) any other interpretation would interfere with Congress' broad spending power.  Each objection will be addressed in turn.

**A) The Byrd Amendment is covered by Section 408**

Defendant and Defendant-Intervenors insist that the Byrd Amendment relates only to proceeds collected from antidumping and countervailing duty orders.  See, e.g., Def.'s Reply at 45, Def.-Int.'s Reply at 63 ("Section 3438 does not cover all amendments to Title VII.  Section 3438, however, by its own terms, applies only to Title VII amendments that apply to goods.  The [Byrd Amendment] applies to money, not goods.").  Therefore, Defendants assert, Byrd Distributions do not "apply to goods" and consequently, fall outside the scope of Section 408.

Specifically, Defendant, citing to numerous definitions of goods, argues that money collected by Customs is not goods. However, Defendant's attempt to read the "apply to goods" clause, in this manner, violates the "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used."  Deal v. United States, 508 U.S. 129, 132 (1993)).  This failure to consider the context in which the "apply to goods" clause is used leads Defendant to erroneously interpret this clause.

When Section 408 is triggered, it does not render an amendment to the trade laws null and entirely void; rather, Section 408 demands that preferential treatment be given to goods from Canada and Mexico by exempting such goods from the auspices

of any qualifying amendment.  The "apply to goods" clause simply imposes a rule of origin requirement thereby articulating which type of imports are exempted from any amendment.   Absent the "apply to goods clause," Section 408 would state that no amendment "shall apply to a NAFTA party" leaving an ambiguous rule of origin, i.e., whether Section 408 covers just goods imported from Canada or Mexico by an importer who is a national of a NAFTA party, any importer importing from a NAFTA party, or any national from a NAFTA party importing from anywhere in the world.  By including the "apply to goods" clause, this potential ambiguity disappears, especially in light of the NAFTA Implementation Act's rules of origin provisions, see, e.g., NAFTA Implementation Act, Section 202(a) ("Originating goods").

This reading is supported by the fact that goods are not used in administering and effectuating the purposes of the antidumping and countervailing duty laws; rather, they are the subject matter, and the only subject matter, regulated by those laws, see Eurodif S.A. v. United States, 411 F.3d 1355, 1361 (Fed. Cir. 2005) (noting that the antidumping statute only applies to goods); 19 U.S.C. § 1671(a) (imposing the same requirement for the countervailing duty statute).  Therefore, the "apply to goods" clause must speak to how the antidumping and countervailing duty laws are administered in relation to goods.

For example, Defendant and Defendant-Intervenors assert that if Congress should find that Commerce is systematically understating dumping margins and therefore amends the antidumping and countervailing duty laws to require Customs to augment all duty margins by five percent, Section 408 would be triggered precluding this amendment from applying to imports from Canada or Mexico. Cf. Def.-Int.'s Reply at 66 (arguing that amendments to the rate of duty would trigger Section 408). However, under Defendant's reading of Section 408, this hypothetical amendment does not apply to "goods," it applies to a rate of duty. Alternatively, Defendant-Intervenors suggest that if Congress changes the rules on proprietary information used in antidumping and countervailing duty proceedings, then Section 408 would be triggered. Def.-Int.'s Reply at 73 n.50. But again, proprietary information is not "goods" either. In other words, Defendant and Defendant-Intervenors' argument would foreclose Section 408 in scenarios where Section 408 must obviously apply.

Relatedly, Defendant-Intervenors argue that the "apply to goods" clause limits Section 408 to amendments that directly apply to goods; because the Byrd Amendment indirectly applies to goods, Defendant-Intervenors claim, Section 408 is not triggered. See, e.g., Def.-Int.'s Reply at 75. But this reading stretches the language of Section 408 beyond recognition; there is simply

no means or basis for distinguishing between <u>direct</u> and <u>indirect</u> applications of any amendment. <u>Cf.</u> SAA, reprinted in H. R. Doc. No. 103-159, p. 203 (1993) ("Section 408 of the bill implements the requirement of Article 1902 that amendments to the AD and CVD laws shall apply to a NAFTA country only if the amendment so states explicitly."). Indeed, such a distinction is belied by Section 408's use of the term "any," <u>i.e.</u>, that "[a]ny amendment" to the enumerated laws shall not apply. Consequently, that Congress sought to change the competitive conditions through disbursements to affected domestic producers, rather than to increase the rate of duty directly, is of no moment.[42]

---

[42]For the most part, tariffs are but a means to an end, not an end in-and-of themselves. The end, of course, is regulating the level of competition domestic producers should face from foreign competitors; by adjusting the tariff rate, Commerce increases the cost to importers of selling in the domestic market, which, in turn, ameliorates the competitive conditions for domestic producers. Indeed, for the most part, the tariff is passed onto the consumer, with the harm to the importer being the increase in the price of its goods vis-a-vis domestic producers. <u>Cf.</u> <u>Bacchus Imp., Ltd. v. Dias</u>, 468 U.S. 263, 267 (1984); <u>accord</u> <u>United States v. Butler</u>, 297 U.S. 1, 63 n.10 (1936) ("The enactment of protective tariff laws has its basis in the power to regulate foreign commerce." (citing <u>Bd. of Trustees of the Univ. of Ill. v. United States</u>, 289 U.S. 48, 58 (1932))). In other words, the Byrd Amendment magnifies the effect of the antidumping or countervailing duty. When properly framed, it is apparent that a subsidy to domestic producers is no more indirect than a tariff itself.

Nor are Defendant-Intervenors' arguments sound as a

practical matter because both the intent[43] and effect[44] of the

_____

[43]See, e.g., Pub. L. No. 106-387, § 1(a), § 1002, 114 Stat. 1549, 1549A-72 ("Consistent with the rights of the United States under the World Trade Organization, injurious dumping is to be condemned and actionable subsidies which cause injury to domestic industries must be effectively neutralized."); id. ("United States trade laws should be strengthened to see that the remedial purpose of those laws is achieved."); id. ("Where dumping or subsidization continues, domestic producers will be reluctant to reinvest or rehire and may be unable to maintain pension and health care benefits that conditions of fair trade would permit. Similarly, small businesses and American farmers and ranchers may be unable to pay down accumulated debt, to obtain working capital, or to otherwise remain viable."); 106 Cong. Rec. S.497-01 (daily ed. Jan. 19, 1999) (Statement of Senator DeWine) ("As my colleagues know, the Tariff Act of 1930 gives the President the authority to impose duties and fines on imports that are being dumped in U.S. markets, or subsidized by foreign governments. Our bill would take the 1930 Act one step further. Currently, revenues raised through import duties and fines go to the U.S. Treasury. Under our bill, duties and fines would be transferred to injured U.S. companies as compensation for damages caused by dumping or subsidization. We believe this extra step is necessary. Current law simply has not been strong enough to deter unfair trading practices.").

[44]See United States Government Accountability Office, Report to Congressional Requesters: International Trade: Issues and Effects of Implementing the Continued Dumping and Subsidy Offset Act, 40-41, 70, 102-04 (2005); Jeanne J. Grimmet, Congressional Research Service Report for Congress: The Continued Dumping and Subsidy Offset Act 21-22 (2005); Congressional Budget Office, Economic Analysis of The Continued Dumping and Subsidy Offset Act of 2000 5-8 (2004). See generally W. Lynn Creamery, 512 U.S. at 210-11 (Scalia, J. concurring) (noting that giving a subsidy would have the same effect as raising the tariff rate); Sykes, supra, at 7-10; Christopher R. Drahozal, On Tariffs v. Subsidies in Interstate Trade: A Legal and Economic Analysis, 74 Wash. U. L. Q. 1127, 1144-50 (1996); William M. Corden, Trade Policy and Economic Welfare 12 (1974) ("The production or protection effect [of a tariff] would be exactly the same as in the case of a subsidy . . . ."); but cf. Bo Södersten and Geoffrey Reed,

(continued...)

Byrd Amendment is to change the competitive environment for importers of goods who are subject to antidumping and countervailing duty orders and to use those laws to accomplish this end.  See, e.g., Huaiyin Foreign Trade Council v. United States, 322 F.3d 1369, 1380 (Fed. Cir. 2003) (the Byrd Amendment's purpose is to "level[] the competitive conditions through negation of the unfair advantage gained by the price difference of imported products."). This is especially evidenced by the fact that Byrd Distributions are allocated from special accounts within the U.S. Treasury to parties who supported the antidumping or countervailing duty order.  19 U.S.C. § 1675c(e), 19 C.F.R. § 159.64.[45]  Under this arrangement, it is apparent that Customs merely holds such duties for affected domestic producers.  Cf. Core Concepts of Fla., Inc. v. United States, 327 F.3d 1331, 1338 (Fed. Cir. 2003) (money spent from special accounts does not constitute an appropriation); United States v. Aiello, 912 F.2d 4, 7 (2d Cir. 1990) ("We do not believe that

_____

[44](...continued)
International Economics 212 (3rd ed. 1994) (effect of a tariff of a foreign producers will be greater than a subsidy).  In essence, subsidies have the effect of raising the rate of duty on importers.
[45]The fact that unclaimed funds are remitted to the general U.S. Treasury is of no moment.  The Byrd Amendment is outcome determinative for any such revenues generated for the U.S. government, and any funds are deposited into the U.S. Treasury only after Customs applies the Byrd Amendment to duty orders.

funds collected by the United States pursuant to a judgment of the District Court are insulated by the Appropriations Clause from return to the rightful owner in the event of a reversal of that judgment simply because the funds are held in the Treasury during the course of the litigation."); Varney v. Warehime, 147 F.2d 238, 245 (6th Cir. 1945) (where the government merely holds such monies for others, the expenditure of those funds is not an appropriation); compare J.W. Hampton & Co., 276 U.S. at 412 ("So long as the motive of Congress and the effect of its [protective tariff scheme] are to secure revenue for the benefit of the general government, the existence of other motives in the selection of the subjects of taxes can not invalidate Congressional action.") with Butler, 297 U.S. at 61 ("'[a] tax . . . as [the term is] used in the Constitution, signifies an exaction for the support of the Government" and, therefore, "has not been thought to [authorize] the expropriation of money from one group for the benefit of another."). As such, it is clear that the Byrd Amendment is part-and-parcel of legislation intended to effectively neutralize the adverse effects of dumped and subsidized goods. See Huaiyin Foreign Trade Council, 322 F.3d at 1380 ("The duties now bear less resemblance to a fine payable to the government, and look more like compensation to victims of anticompetitive behavior."); See 106 Cong. Rec. S.

497-01 (daily ed. Jan. 19, 1999) (Statement of Senator DeWine) ("It's time we impose a heavier price on dumping and subsidization. . . . Under our bill, foreign steel producers would get a double hit from dumping: they would have to pay a duty, and in turn, see that duty go directly to aid U.S. steel producers.").

In sum, essentially, the Byrd Amendment converts what was just a tariff into a broader compensatory regime. Certainly, this change in the nature of the remedies available under the trade laws is something Section 408 is meant to foreclose as to Canadian and Mexican goods where Congress has not explicitly stated an intent to change the statutory remedies as to Canada and Mexico.

**B) The Byrd Amendment Does Not Supersede Section 408**

Defendant and Defendant-Intervenor next argue that, even if Section 408 is applicable, the Byrd Amendment supersedes Section 408. As Defendant-Intervenor points to Section 102(a) of the NAFTA Implementation Act, codified at 19 U.S.C. § 3312(a), which requires that "[n]o provision of the Agreement, nor the application of any such provision to any person or circumstance, which is inconsistent with any law of the United States shall have effect." (Emphasis added). As discussed above, however,

Section 408 is a provision of statutory law, not a provision of NAFTA.  Therefore, 19 U.S.C. § 3312(a) is not implicated here. Moreover, even if Section 102(a) were implicated, there is no inconsistency between the Byrd Amendment and Section 408.  On the contrary, the two are easily reconciled by limiting the reach of the Byrd Amendment to non-NAFTA goods.  <u>Cf.</u> <u>Spector v. Norwegian Cruise Line Ltd.</u>, 125B S. Ct. 2169, 2182 (2005).  Therefore, Defendant-Intervenors' argument must fail.

Alternatively, during oral argument, Defendant argued for the first time that the Byrd Amendment by itself satisfied the "magic words" requirement of Section 408.  Relying on Justice Scalia's concurrence in <u>Lockhart v. United States</u>, 126 S. Ct. 699, 702 (2005), and the Supreme Court's opinions in <u>Marcello v. Bonds</u>, 349 U.S. 302, 210 (1955), and <u>Great N. R. Co. v. United States</u>, 208 U.S. 452, 465 (1908), Defendant argues that no "magical password" is required for Congress to supersede the requirements of Section 408.  Therefore, Defendant claims, the Byrd Amendment satisfies the requirements of Section 408.

Although the Defendant may be correct that "no magical password" is necessarily required, this precedent does not mean that Section 408 is a dead-letter.  Rather, the Court has held that provisions, such as Section 408, may be superseded "expressly or by necessary implication in a subsequent

enactment." Great Northern R. Co. v. United States, 208 U.S. 452, 465 (1908). Accord Warden v. Marrero, 417 U.S. 653, 659-660 n.10 (1974) (express statement provisions may be superceded by "fair implication"). Here, there exists no "express" statement nor is there any "necessary implication," or even "fair" implication, that Congress intended to trump Section 408 when enacting the Byrd Amendment. Therefore, to read the general language of the Byrd Amendment as satisfying the requirements of Section 408 would essentially render Section 408 a dead-letter. The cases upon which Defendant relies do not support this conclusion.

Nor does the court find Justice Scalia's constitutional arguments availing (as applied here). According to Justice Scalia, provisions such as Section 408 tend to "entrench" legislation, i.e., make it more difficult for subsequent legislatures to repeal a law. Lockhart, 126 S.Ct. at 703; cf. Eric A. Posner and Adrian Vermeule, Legislative Entrenchment: A Reappraisal, 111 Yale L.J. 1665, 1697-99 (2002). Because "'one legislature cannot abridge the powers of a succeeding legislature.'" Lockhart, 126 S. Ct. at 703 (quoting Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 135 (1810)), such legislation should

be read narrowly – if considered at all.[46]  Although these premises or principles are unquestionably true, see, e.g., United States v. Winstar Corp., 518 U.S. 839, 872 (1996), such principles are not implicated here.  To the contrary, Section 408 may be repealed, or satisfied, by a simple majority in both houses (assuming no presidential veto).  Therefore, Section 408 is not unduly restrictive of Congressional prerogatives.

All Section 408 purports to do is "function as background canon[] of interpretation of which Congress is presumptively aware."  Lockhart, 126 S. Ct. at 703.  Indeed, provisions such as Section 408 are no more entrenching than canons of statutory interpretation under which courts require Congress to conform. See, e.g., Hartford Fire Ins. Co. v. Cal., 509 U.S. 764, 814-15 (1994) (Scalia, J. dissenting) (noting that Charming Betsy canon compelled a certain interpretation of a federal statute); EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 260 (1991) (Scalia, J.

_____

[46]Justice Scalia concluded his dissent with the observation that, "[i]n any event, I think it does no favor to the Members of Congress, and to those who assist in drafting their legislation, to keep secret the fact that such express-reference provisions are ineffective."  Lockhart, 126 S. Ct. at 704.  The court notes that Justice Scalia's theory, depending on how construed, could have staggering effects.  Numerous pieces of legislation purport to define rules of interpretation such as the: Dictionary Act, 1 U.S.C. § 1; Defense of Marriage Act, 1 U.S.C. § 7; General Rules of Interpretation of the Harmonized Tariff Schedule of the United States, 19 U.S.C. § 1202;  Religious Freedom Restoration Act of 1993,  42 U.S.C. § 2000bb-3(b); National Emergencies Act, 50 U.S.C. § 1621.

concurring) (clear statement rules, such as the presumption against extraterritoriality, overcome <u>Chevron</u> deference).

Furthermore, as noted by Justice Scalia, provisions such as Section 408 may "add little or nothing to . . . already-powerful" canons of interpretation. <u>Lockhart</u>, 126 S. Ct. at 703-04. In this case, for example, Section 408 exists to protect the United States' obligations under NAFTA. Indeed, powerful canons do exist to protect such interests. <u>See</u>, <u>e.g.</u>, <u>Weinberger v. Rossi</u>, 456 U.S. 25, 32 (1982); <u>McCulloch v. Sociedad Nacional de Marineros de Honduras</u>, 372 U.S. 10, 21-22 (1963) (overturning the NLRB's construction of a statute because Congress did not clearly state that it intended to violate the law of nations); <u>FPC v. Tuscarora Indian Nation</u>, 362 U.S. 99, 142 (1960) (Black, J. dissenting) ("Great nations, like great men, should keep their word."); <u>Roeder v. Islamic Republic of Iran</u>, 333 F.3d 228, 237-38 (D.C. Cir. 2003) (holding that Congress must speak with a clear statement if it intends to abrogate an international agreement). Consequently, because Section 408 is supported by, and plays a complementary role with, canons of interpretation, the logic Justice Scalia advances does not preclude application of Section 408 here.

Accordingly, Defendant's argument must be rejected.

**C) Nature of Congressional Power employed is not relevant**

As a last resort, Defendant and Defendant-Intervenors argue that Congress has broad authority under the Spending Clause, U.S. Const. art. I, § 8, which this court would trample were the court to adopt Plaintiffs' construction of Section 408.  See, e.g., Def.'s Reply at 42; Def.-Int.'s Reply at 72 (arguing that the Byrd Amendment "addresses the disbursement of U.S. Treasury funds that have become property of the United States Government subsequent to the imposition of AD/CVD duties . . . . Once the funds become property of the U.S. Government, the Congress has the constitutional power to dispose of the monies under the Spending Clause." (emphasis in original)).  This case, however, has nothing to do with Congress' spending power.  What is at issue is whether the Commissioner is properly distributing monies derived from duty orders on goods from Canada or Mexico, i.e., whether the Commissioner is properly exercising her statutory authority where the Byrd Amendment does not specify that it applies to goods from a NAFTA country.

The Byrd Amendment, when read correctly, in light of Section 408, states that distributions should be made from duties collected pursuant to antidumping and countervailing duty orders except for duty orders on goods from Canada and Mexico. Accordingly, Congress has not authorized the Commissioner to

distribute duties collected on goods from Canada and Mexico; in fact, by failing to specify that the Byrd Amendment applies to Canada and Mexico, Congress has exercised its authority to preclude such distributions.

Assuming arguendo that the Byrd Amendment is even an appropriations measure, because the Constitution grants Congress the plenary and exclusive authority to expend monies from the federal treasury, see U.S. Const. art. I, § 7, a fortiori, the U.S. Constitution does not grant the executive branch authority to expend monies not appropriated by Congress, see, e.g., Office of Pers. Mgmt v. Richmond, 496 U.S. 414, 424 (1990) ("Our cases underscore the straightforward and explicit command of the Appropriations Clause. 'It means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress.'") (quoting Cincinnati Soap Co. v. United States, 301 U.S. 308, 321 (1937)).  Therefore, because the Commissioner has no authority either under an Act of Congress or under the Constitution to make the distributions at issue here, her actions in distributing such funds are ultra vires and therefore unlawful.  Furthermore, the language of Section 408 does not speak to the type of Congressional authority invoked, but to the laws to which amendments are to be made.

The parties also dispute the level of deference owed to Customs' interpretation of Section 408.  Because there is no hint of ambiguity in Section 408, the plain language of Section 408 must govern, any deference owed Customs notwithstanding.  See Chevron U. S. A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-843 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court,  as well as the agency, must give effect to the unambiguously expressed intent of Congress."); see also Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 600 (2004) ("Even for an agency able to claim all the authority possible under Chevron, deference to its statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent."); Barnhart v. Sigmon Coal Co., 534 U.S. 438, 462 (2002) ("In the context of an unambiguous statute, we need not contemplate deferring to the agency's interpretation."); Ad Hoc Comm. of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States, 13 F.3d 398, 403 (Fed. Cir. 1994) ("Because we believe the antidumping statute is not silent on the question . . . the reasonableness or fairness of Commerce's interpretation of the Antidumping Act is irrelevant.).

Therefore, based on Congress' plain language in Section 408, Customs is not authorized to apply the Byrd Amendment to goods from Canada or Mexico.


## VI. REMEDY

The parties also disagree on the appropriate remedy. Plaintiffs seek both prospective injunctive relief, and disgorgement of all past distributions as permitted by Customs' regulations, 19 C.F.R. § 159.64(b)(3). Defendant argues that 19 C.F.R. § 159.64(b)(3) only permits Customs to disgorge any "overpayments," and that, because Plaintiffs seek disgorgement of the entirety of past distributions, Plaintiffs do not seek disgorgement of an "overpayment." Def.'s Reply at 50. Defendant further asserts that Plaintiffs have slept on their rights for six years, i.e., from the time the Byrd Amendment was passed until the filing of the Complaints rendering (at least retrospective) relief inappropriate. Defendant also avers, without elaboration, that "the Court should exercise its discretion to limit any remedy to prospective relief." Def.'s Reply at 50 (citing Independence Mining Co. v. Babbitt, 105 F.3d 502, 506-07 (9th Cir. 1997); Or. Nat'l Res. Council v. Harrell, 52 F.3d 1499, 1508 (9th Cir. 1995)).

Because the parties have devoted little energy to briefing the question of remedy, and because the dismissal of Canada's claims may impact the parties' briefing on this question, the court hereby orders further briefing with respect to remedy.[47]

## CONCLUSION AND ORDER

For the foregoing reasons, Defendant's motion to dismiss the Government of Canada is granted; the Defendant's motion to dismiss with respect to the Canadian Producers is denied.

The court hereby ORDERS that the parties shall meet and confer concerning an appropriate remedy; the parties shall submit any jointly proposed remedy to the court no later than May 8, 2006; if the parties do not agree on a proposed remedy, the parties shall by said date submit recommendations and arguments to the court concerning the proper remedy and the scope of such remedy.

---

[47]In considering the appropriate remedy, the court asks the parties to bear in mind the following considerations: (1)The court has found unlawful Byrd Amendment distributions of antidumping and countervailing duties on goods from a NAFTA country; (2) disgorgement of monies for which Canada has already retaliated may unjustly enrich Canada at the expense of the United States; (3) the public interest in seeing money properly deposited in the United States' Treasury, and (4)the lack of authority the Commissioner has here exercised in distributing such funds.

IT SO ORDERED.


                                                    /s/
                                          Donald C. Pogue, Judge


Dated:     April 7, 2006
           New York, NY